**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**

|  |  |
|---|---|
| THE WESTERN AND SOUTHERN LIFE INSURANCE COMPANY, WESTERN & SOUTHERN FINANCIAL GROUP, INC., INTEGRITY LIFE INSURANCE COMPANY, and TOUCHSTONE STRATEGIC TRUST, | Case No. _____ Judge _____ |
| Plaintiffs, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| TESCO PLC, |  |
| Defendant. |  |

Plaintiffs The Western and Southern Life Insurance Company, Western & Southern

Financial Group, Inc., Integrity Life Insurance Company (collectively "Western & Southern"),

and Touchstone Strategic Trust ("Touchstone") (Western & Southern and Touchstone are

referred to collectively as "Plaintiffs") for their Complaint against Defendant Tesco PLC

("Tesco" or the "Company"), hereby allege upon knowledge as to themselves and their own

conduct, and upon information and belief as to all other matters, as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action arises out of Plaintiffs' purchase of approximately 4 million shares of

Tesco American Depositary Receipts (the "ADRs") during the period of March 2012 through

July 2014 (the "Relevant Period") at an average price of approximately $16.22 for an aggregate

price of almost $65 million.  The ADRs represent interests in shares of Tesco, a British grocery

and general merchandise retailer.  A table identifying each purchase and sale of Tesco ADRs by

Plaintiffs is attached hereto as **Exhibit A**.

2.      In late 2014, Tesco announced that it had dramatically overstated its revenues

through the improper recognition of "commercial income," *i.e.,* promotional monies, discounts and rebates received from suppliers.  In sum, Tesco was recording commercial income when it had not earned such income and failed to timely record expenses associated with commercial income that was booked.  To date, the Company has reduced its reported revenues by £326 million ($500 million) due to its improper accounting for commercial income through a series of accounting restatements.

3.     These massive restatements were the byproduct of a "whistleblower" within Tesco that raised problems with the Company's faulty accounting and financial reporting.  The "whistleblower" that disclosed the accounting fraud to incoming CEO Dave Lewis in September 2014 also revealed the fraud months earlier to Tesco senior executives, who summarily ignored the whistleblower's report.  According to a senior source at Tesco, the *International Business Times* reported on September 29, 2014 that the Tesco whistleblower had "alerted senior executives to the £250 million shortfall in profits on the retailer's books," which was "ignored for months."  The whistleblower had "alerted senior bosses at Tesco in July [2014] of concerns but 'failed to get traction.'"  However, once new management led by Lewis was put into place, Tesco's financial manipulations were made public.  The whistleblower uncovered a fraud that by current Tesco reports amounts to half a billion dollars.

4.     By definition, Tesco's accounting restatements are an admission that Tesco's financial statements for 2012/13, 2013/14 and 2014/15[1] contained materially false representations to the investing public.  Plaintiffs' investment advisor, Jamie Wilhelm of Fort Washington Investment Advisors, Inc., an affiliate of Western & Southern and sub-advisor for Touchstone, reviewed and relied on the Company's 2012/13-2014/15 financial statements prior

---

[1] Tesco's fiscal year ends in the last week of February each year.

to purchasing Tesco ADRs for Plaintiffs. He also had in person meetings with Tesco employees where they touted, among other things, Tesco's leverage over suppliers that allowed it to earn lucrative commercial income. Tesco never disclosed during these meetings, or in regularly exchanged correspondence between Mr. Wilhelm and Tesco, that it relied on accounting chicanery to meet revenue targets.

5.     The value of Tesco ADRs plummeted on September 22, 2014, when the first of multiple accounting restatements was announced, disclosing that Tesco had inflated its revenues by £250 million ($380 million) during the first half of 2014/15 and prior years. Dave Lewis, Tesco's new CEO, reported that the accounting manipulations were a "serious issue," hired the accounting firm Deloitte LLP and the law firm Freshfields Bruckhaus Deringer to investigate, and immediately suspended four senior executives, including the head of the company's UK business, Chris Bush. By September 22, 2014, the price of Tesco ADRs had fallen to $9.61 per share. Both Western & Southern and Touchstone sold a significant portion of their holdings in Tesco ADRs in October 2014 as it became increasingly apparent that Tesco's financials were a black box that could not be trusted.

6.     On October 23, 2014, Tesco revealed the results of its outside auditor, Deloitte LLP, which concluded that Tesco overstated its commercial income by £263 million ($400 million) in the first half of 2014/15 and for prior years, higher than previously announced. Deloitte further confirmed that the overstatements were based on accounting practices that were contrary to Tesco's accounting policies. At this time, Tesco admitted that the accounting manipulation was not relegated to the 6-month period in 2014 under investigation by revealing that "there have been similar practices in prior reporting periods," but did not quantify the overstatement for prior periods. Tesco also announced that its Chairman, Richard Broadbent,

was resigning.

7.      On April 22, 2015, Tesco once again revised and increased its overstatement of commercial income to £326 million ($500 million) overall.  In addition, the Company reported a £6.38 billion ($9.68 billion) loss for the year ended February 28, 2015, the largest one-year loss in the Company's or any British retailer's history.  This £6.38 billion *record loss* contrasts with the Company's reported £2.26 billion *profit* the year before and a purported £3.8 billion *record profit* for 2011/12.  The majority of the loss was attributable to a £4.7 billion impairment of fixed assets, which was based in large part on the write-down of commercial income earned at Tesco's stores, making such stores significantly less valuable.  In other words, Tesco's overstatement of revenue being generated by Tesco's stores caused them to be overvalued by the Company to the tune of almost £5 billion.  The Plaintiffs' decision to invest in the Tesco ADRs was based in large part on the value of Tesco property, which was only later revealed to be an illusion of Tesco's own creation.

8.      In all, at least ten senior Tesco executives have been removed from their positions, including its Chairman (Richard Broadbent), CEO (Philip Clarke), CFO (Laurie McIlwee), and UK Managing Director (Chris Bush).  Tesco's fraudulent accounting is now the focus of an investigation by (i) the Financial Conduct Authority ("FCA"), the UK's financial regulatory body, (ii) Her Majesty's Revenue and Customs ("HMRC"), the UK's taxing authority, (iii) a criminal investigation by the UK's Serious Fraud Office ("SFO"), and (iv) the UK Groceries Code Adjudicator, the UK government entity responsible for enforcing compliance with the Groceries Supply Code of Practice.  The UK Groceries Code Adjudicator announced a formal investigation based on a "reasonable suspicion that the [Groceries Supply Code of Practice] has been breached by Tesco plc by some of its practices associated with the profit over-

statement announced by the company in September 2014." This is the first investigation ever by the Adjudicator who stated that she has evidence that Tesco's misconduct "were not isolated incidents, each involving a number of suppliers and significant sums of money." In its 2015 Annual Report, Tesco's new management admitted to, among other things, "probable breaches" of the UK Groceries Supply Code, as well as "regret[table]" actions with respect to the "commercial income issue."

9.      Tesco's manipulation of commercial income largely manifested itself in the Company's improper conduct with its suppliers. In fact, Plaintiffs' investigation uncovered numerous confidential witnesses that personally attested to Tesco's improper practices.[2] For example, CW1 was one of the largest potato suppliers to Tesco in the UK, and CW2 and CW3 were suppliers of a popular sports drink to Tesco. In order to meet Tesco's revenue targets, it demanded up-front payments from CW2 to begin offering the sports drink in new flavors at Tesco's stores, which CW2 never agreed to accept. Tesco also began issuing bogus invoices to the suppliers for things that the suppliers never agreed to – such as more favorable, eye-level positioning in grocery store aisles or attaching pieces of paper with "New" under the products to draw the shopper's eye. Each of CW1 (potato supplier), and CW2 and CW3 (sports drink suppliers) refused to pay the bogus invoices because they never agreed to such promotions in the first place.

10.      In Tesco's Loss Update dated April 22, 2015, Tesco released for the first time its understanding of what constitutes commercial income entitled to be counted as a receivable for the reporting period. Tesco admitted that commercial income includes "[a]mounts that have been invoiced to suppliers but not yet received." Loss Update at 8. In other words, Tesco issued

---

[2] Plaintiffs' confidential witnesses are defined herein as "CW__."

bogus invoices to suppliers for the sole purpose of reporting amounts owed as income in its financials. After new management at Tesco headed by new CEO Dave Lewis took over, Tesco's relationship with suppliers dramatically changed. In fact, a Tesco employee in charge of buying Tesco's soft drink and juice products actually apologized to CW3 in person, admitting that the Company's prior conduct with respect to CW3's sports drink was improper.

11.     Tesco's misrepresentations are actionable under the Ohio Securities Act, including O.R.C. §§ 1707.43, 1707.44(G), and 1707.44(J), Section 10(b) of the Securities Exchange Act of 1934, and under the common law.

## **PARTIES**

12.     Plaintiff Integrity Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. It sells life, accident and health insurance and annuity products. Integrity Life Insurance Company purchased approximately 62,000 Tesco ADRs for a total cost of more than $1 million from approximately June 21, 2013 through December 5, 2013.

13.     Plaintiff The Western and Southern Life Insurance Company is an insurance company formed under the laws, and domiciled in, the State of Ohio, with its principal place of business in Cincinnati, Ohio. It sells life insurance and annuity products. The Western and Southern Life Insurance Company purchased approximately 1.3 million Tesco ADRs for a total cost of more than $21.5 million from approximately March 12, 2012 through March 17, 2014.

14.     Plaintiff Western & Southern Financial Group, Inc. is an Ohio company with its principal place of business in Cincinnati, Ohio. It is the ultimate parent of Plaintiffs The Western and Southern Life Insurance Company and Integrity Life Insurance Company. Western & Southern Financial Group, Inc. purchased approximately 684,000 Tesco ADRs for a total cost of

more than $11 million from approximately March 20, 2012 through February 5, 2014.

15.     Plaintiff Touchstone Strategic Trust is an open-end, managerial investment company, and is a registered Massachusetts business trust, with its principal place of business located in Cincinnati, Ohio. Touchstone Focused Fund is a series of the Touchstone Strategic Trust that purchased more than 1.8 million Tesco ADRs for a total cost of approximately $29 million from approximately April 20, 2012 through July 28, 2014.

16.     Defendant Tesco plc ("Tesco" or the "Company") is a multinational grocery and general merchandise retailer headquartered in Cheshunt, Hertfordshire, England, UK. Tesco's ordinary shares are traded on the London Stock Exchange under the symbol "TSCO.L" and Tesco's ADRs are traded on the over-the-counter market OTC Pink Marketplace ("OTC Pink") under the symbol "TSCDY."

17.     Non-party Philip Clarke ("Clarke") was the Chief Executive Officer ("CEO") of Tesco during the Relevant Period until Tesco announced that Mr. Clarke was being forced to resign on July 21, 2014.

18.     Non-party Laurie McIlwee ("McIlwee") had over a decade-long career at Tesco and was the Company's Chief Financial Officer ("CFO"). Mr. McIlwee resigned as Tesco's CFO in April 2014.

19.     Non-party Sir Richard Broadbent ("Broadbent") was Chairman of the Board of Tesco during the Relevant Period until his resignation on October 23, 2014.

20.     Non-party Chris Bush spent nearly 30 years at Tesco, including as the Chief Operating Officer for the Company's UK business, and served as the Managing Director of Tesco's UK business during the Relevant Period, until his resignation in or around September 2014.

21.     Non-party John Allan is the current Chairman of the Board of Tesco, who was appointed to that position on February 17, 2015, after former Chairman Broadbent announced his resignation on October 23, 2014.

22.     Non-party Dave Lewis is the current Chief Executive Officer of Tesco, and was appointed to that position on September 1, 2014 after the announcement of Mr. Clarke's dismissal on July 21, 2014.

23.     Non-party Alan Stewart is the current Chief Financial Officer of Tesco, after being appointed to the position on September 23, 2014. Mr. Stewart replaced Mr. McIlwee after his resignation in April 2014.

## JURISDICTION AND VENUE

24.     The claims asserted include claims under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), as well as Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over Tesco pursuant to 15 USC § 77aa because Tesco disseminated materially false and misleading statements in Ohio and Plaintiffs' purchases were made in Cincinnati, Ohio. This Court also has federal question jurisdiction under 28 U.S.C. §§ 1331 and 1337. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

25.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

26.     Tesco is further subject to jurisdiction under O.R.C. § 2307.382(A)(3), (A)(6), and (A)(7). As set forth below in Section III, many of the acts giving rise to the violations complained of herein relate to the dissemination of materially false and misleading statements

directly to Western & Southern personnel located in this District. At least three employees in

Tesco's Investor Relations department in London had telephone calls with, and sent at least 75

emails and other correspondence to Plaintiffs' investment advisor in Cincinnati, Ohio

concerning, among other things, Tesco's business plans, answering specific questions about

Tesco's financials and market share and forwarding Tesco's financial reports. These

communications began in February 2012 and continued through at least September 2014.

27.     Plaintiffs' email communications included the Ohio address and telephone

number of Plaintiffs and their investment advisor. As a result, it is clear these Tesco

representatives were aware that they were communicating with an investment advisor in Ohio.

Moreover, Plaintiffs' investment advisor engaged in in-person meetings with Tesco employees

during which he disclosed that he was based in Ohio and purchasing Tesco ADRs on behalf of

Western & Southern and Touchstone.

28.     Venue is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa

and 28 U.S.C. § 1391(b).

## SUBSTANTIVE ALLEGATIONS

I.      **BACKGROUND**

     **A.     Plaintiffs' Purchase of Tesco ADRs**

29.     Tesco's ordinary shares trade on the London Stock Exchange, and the Company's

ADR shares trade in the over-the-counter markets in the United States. An ADR is a security

issued by a U.S. depository bank to domestic buyers as a substitute for direct ownership of stock

in foreign companies. An ADR can represent one or more shares, or a fraction of a share, of a

non-U.S. company.

30.     From March 2012 through July 2014, Plaintiffs purchased approximately 4

million Tesco ADRs at an average price of approximately $16.22 for an aggregate purchase price of almost $65 million.  *See* Ex. A.

      **B.**      **The Plan to "Build a Better Tesco"**

31.      Based in Cheshunt, UK, Tesco is the largest retailer in the UK and the third-largest retailer in the world, with annual sales behind only Wal-Mart Stores Inc. and France's Carrefour SA.  The Company operates stores in 12 countries, with 7,800 stores and over 500,000 employees.  Although Tesco's operations are global, its profit center is still in the UK, which accounts for 70% of its annual sales.

32.      Tesco began as a discount business under the "pile it high, sell it cheap" motto of the Company's founder, Sir Jack Cohen.  While Tesco has been the dominant retailer in the UK for many years, peaking in 2007 with market share of 31.0%, Tesco abandoned its discount model in favor of a multi-format strategy in the face of increasing competition.  Driven at least in part by increased competition from discount UK retailers such as Aldi and Lidl, as well as more upscale stores like Waitrose and Marks & Spencer, Tesco sought to grow sales by expanding store size (following Wal-Mart's model), while at the same time seeking out more upscale customers, developing online sales through grocery home shopping, and pursuing new pricing and other strategies.  Tesco's initiatives failed.

33.      Following a further decline in the Company's UK sales, in April 2012, Tesco unveiled a £1 billion UK revival plan, termed "Build a Better Tesco," which included upgrading stores and recruiting more staff while promising better prices and value in response to complaints that its UK stores were cold and industrial with poor customer service.  The Company claimed it was making investments in its UK stores, which the Company predicted would yield significant returns over the long-term.

34.     On April 17, 2013, Clarke reassured investors in a press release of Tesco's preliminary financials for 2012/13 that - despite another drop in profits - the Company was making progress in the UK, and that the Company's "Build a Better Tesco" strategy was working.  Clarke reported that like-for-like sales[3] were up 0.5% in the final quarter of the financial year, its best reported performance in the UK for three years.  Commenting on those results, Clarke told investors that "I've been working for Tesco for nearly 40 years and I can tell you this — it already looks, feels and acts like a different and a better business."

35.     Tesco touted the "progress" and "strengthening" of the Company's UK business through its "Build a Better Tesco" strategy.  In addition, the Company's executives claimed to have renewed the Company's commitment to transparency to shareholders.  For example, in Tesco's Annual Report for the 2013/14 fiscal year, the Company told investors that it had purportedly enhanced its financial disclosures and strengthened its commitment to ensuring "***levels of transparency and disclosure [to shareholders] which are undoubtedly now world-leading***."  In truth, however, the Company's reported financial results were not driven by a change in business strategy or Tesco's actual financial performance, but were the result of fraud.  The Company engaged in various practices specifically designed to artificially inflate Tesco's reported profits, including by improperly recognizing commercial income and delaying accrued costs.

### C.     Tesco's Scheme to Inflate Commercial Income

36.     In the grocery business worldwide, commercial income can be earned from suppliers and vendors in various ways.  For example, supermarkets can earn premiums that reduce the net cost of their stock through favorable shelf positioning of products, or by

---

[3] "Like-for-like" sales is a performance indicator for retailers comparing sales performance over similar time periods across different years, after adjusting for new or divested business.

displaying supplier-provided signage in its stores.  Supermarkets can also earn discounts and rebates by exceeding predetermined sales or purchase volume targets, and by reducing or agreeing not to make returns.

37.     Under standards developed by the International Accounting Standards Committee ("IAS"), discussed more fully below in Section IV, Tesco was not permitted to book revenue unless it was "probable" that such revenue was earned and such revenue could be "measured with reliability."  IAS standards further provide that rebates and purchase discounts are not recorded as revenue, but as a reduction to the cost of inventory, or, if the inventory has already been sold, as a reduction to the cost of sales.

38.     Accordingly, commercial income cannot be recorded as revenue unless cash was paid to Tesco by suppliers, manufacturers or third party distributors for meeting incentive targets or other promotional purposes.  Rebates and discounts could not be booked as revenue, but could be recorded as a reduction to either the cost of inventory or cost of sales, depending on whether the retailer (Tesco) sold the merchandise during the reporting period.

39.     Whether in the form of premiums, rebates or discounts, commercial income has the effect of improving the retailer's margins when the retailer legitimately and actually achieves the contractually agreed numerical targets in the relevant period.  However, Tesco booked such commercial income prematurely before receiving any cash from suppliers or even hitting the previously agreed upon sales targets.

40.     Tesco entered into agreements with its suppliers in which, in exchange for purchasing and selling large volumes of products, Tesco would receive discounts and rebates, which it would immediately count as revenue in the form of commercial income.  Additionally, even though it had already booked the income, Tesco did not have the ability to turn around and

sell the products in sufficient quantity to obtain the discounts.  Similarly, Tesco demanded payments for supplier promotions up-front, booking the payment as revenue prematurely even though the suppliers would undeniably dispute the payments later, in violation of Tesco's own accounting policies, as well as the UK Groceries Supply Code of Practice.

41.     Tesco also manipulated the recognition of commercial income in order to report revenue growth in the immediate reporting period with the expectation that the unearned gains previously reported could become legitimate once the targets were actually met in future periods. In other words, Tesco would borrow from expected financial gains in the subsequent period to demonstrate revenue growth immediately in the current reporting period.  However, when the next reporting period brought another sales shortfall or were flat, Tesco was forced to borrow even more money from the next period, resulting in a devastating cycle of what a leading Tesco supplier has described as "robbing Peter to pay Paul and now Peter has run out of money."[4]

42.     As explained in a BBC reporter's account, one former Tesco executive said that the heads of the Company's divisions would place a call as the end of half year approached, and "'[f]ind me £30 [million]' would be the message."  The Tesco employees, would then, in turn, "demand more and more from suppliers."  These kinds of practices are in direct violation of the UK Groceries Supply Code of Practice.  Nevertheless, Tesco claimed in its financial reports that its "embedded Group Code of Business Conduct, Bribery Act and UK Groceries Supply Code of Practice guidelines guide our behavior in dealing with customers, employees, suppliers and other stakeholders," and that "[c]ompliance with the UK Groceries Supply Code of Practice ('Code') is carefully monitored by our Code Compliance Officer."

---

[4] *See* Ian Quinn, *Suppliers divided over nature of Tesco crisis*, The Grocer (Sept. 29, 2014), http://www.thegrocer.co.uk/channels/supermarkets/tesco/suppliers-divided-over-nature-of-tesco-crisis/372000.article.

43. According to a May 11, 2015 article entitled "Tesco's darkest hour: The inside track on Phil Clarke's final chapter" written by Rupert Steiner for the Daily Mail and published on thisismoney.co.uk,[5] former and current Tesco insiders shed light on Clarke's contributions to Tesco's problems.  One source stated that Clarke "was putting huge pressure on people to deliver the numbers" and that "[t]he phrase that came out was, 'I don't care how you do it, just do it.'" In this way, insiders suggested that "they were pushed to the limit to improve performance."

44. Tesco also engaged in a scheme, referred to internally as "offshoring" in order to smooth revenue growth.  This involved delaying the financial reporting of profit in order to make the appearance of profit growth over consecutive reporting periods.  For example, when Tesco exceeded its sales projections for a particular accounting period, Tesco told a supplier to keep £23 million in excess profit in a separate, designated account controlled by the supplier so that Tesco would not have to report the income in the particular accounting period.  The supplier was instructed to transfer the funds in the subsequent accounting period so that Tesco could artificially report profit growth over time.

45. Further, Tesco engaged in a practice known as "retro-active" billing whereby a supplier would agree to manipulate sales prices so that Tesco could report inflated profits.  For example, Tesco would agree to purchase a particular type of champagne for £120 per case with six bottles per case.  However, Tesco would tell the supplier to invoice the champagne at £140 per case.  Sometime later, the supplier would then credit Tesco with the £20 difference.  In essence, Tesco would be gaining an additional £20 per case, on top of the additional spread that Tesco realizes when it sells the champagne to individual customers.  The HMRC, the UK's

---

[5] *See* http://www.thisismoney.co.uk/money/markets/article-3077087/Tesco-s-darkest-hour-inside-track-Phil-Clarke-s-final-chapter.html.

taxing authority, is currently investigating Tesco's retro-active billing practices.

46.     In addition, Tesco employees in an effort to boost profits would simply ignore internal guidelines with respect to Tesco's treatment of suppliers.  According to a Communications and Operations Assistant at Tesco during the Relevant Period that was cited as "CW1" in the Consolidated Amended Class Action Complaint in *In re Tesco Securities Lit.*, Case No. 14-08495 (S.D.N.Y.), filed on June 18, 2015 (the "Class Action Complaint"), "Tesco's treatment of promotional pricing did not often comply with the legal team's guidance.  CW1 stated that management endorsed this noncompliance."  Class Action Compl. ¶ 10.

### D.     Manipulation of Suppliers in Furtherance of Tesco's Scheme

47.     As Tesco's actual revenues fell, Tesco dramatically increased the pressure on suppliers for the recognition of commercial income, even though such practices were not permitted under the applicable accounting rules or Tesco's own stated accounting principles.

48.     For example, on October 28, 2013, the *Daily Mail* published an article entitled in part "Leaked memo reveals supermarket charges thousands to help boost profits."[6]  The article detailed a leaked memorandum that was prepared by Tesco's ingredients buying manager, James Marshall, which was sent to Tesco's suppliers.  In the memorandum, Tesco began demanding payments from suppliers for shelf-positioning at eye-level, with only bottom-level (least favorable) positioning not requiring any charge.  The new tactic was described as a "ploy [by Tesco] to boost profits at [the] expense of suppliers."  According to one angry supplier that received the memorandum:

"Tesco are making it increasingly unattractive to do business with them.  We

---

[6] *See* Sean Poulter, *Pay up for an eye-level spot on the shelf, Tesco tells its suppliers: Leaked memo reveals supermarket charges thousands to help boost profits*, Daily Mail (October 28, 2013), http://www.dailymail.co.uk/news/article-2478652/Leaked-memo-reveals-Tesco-charges-thousands-help-boost-profits.html.

won't support this.

And as a leading brand, if we are then positioned on the bottom shelf, how is that serving the needs of the Tesco customer?"

49.     In November 2013, Mike Dennis, an analyst at the investment bank Cantor Fitzgerald criticized the Company's aggressive treatment of suppliers, suggesting that Tesco had prematurely demanded payments from suppliers in an effort to support the Company's short-term profit margins.  Mr. Dennis also reported that Tesco suppliers had shown him letters from Tesco demanding discounts after the fact.  At the time, Tesco officials flatly denied any problems with its treatment of suppliers, stating that Cantor Fitzgerald's criticisms were "based only on speculation."  As described below in Sections II(C) and II(D), Tesco later admitted to such practices in, among other things, Tesco's Annual Report for the 2014/15 fiscal year and statements made to reporters and analysts concerning the financial reporting manipulation.

50.     There are numerous individual accounts of Tesco's improper practices with respect to suppliers.

### i.      L'Oreal/Procter & Gamble

51.     According to a BBC investigation, L'Oreal, one of the world's largest cosmetics companies, threatened legal action after disputing £1 million worth of charges, fines, and fees demanded by Tesco in connection with its supplier agreements.  Tesco later released a statement downplaying the dispute, but admitting that "[d]ifferences do sometimes occur in the course of commercial relationships."  A former buying manager in Tesco's Procurement division that was cited as "CW2" in the Class Action Complaint, stated that Tesco was a "'bully' with its suppliers and would 'batter' the suppliers until they gave Tesco rebates and whatever else the Company wanted."  Class Action Compl. ¶ 41.  Indeed, this former buying manager specifically remembered the dispute with L'Oreal:

16

> According to CW2, in the summer of 2014 an internal frenzy erupted at Tesco as a result of L'Oreal resisting Tesco's pressure tactics.  While meeting with a representative in Tesco's legal department to discuss the terms of the procurement team's contracts with suppliers, CW2 noticed that employees in the legal department were particularly tense and "running around in a panic."  CW2 asked a colleague from the legal team to explain, and the colleague said that Tesco had tried to pressure L'Oreal into providing a higher rebate by threatening to remove L'Oreal's products from Tesco's shelves, and L'Oreal would not buckle under the pressure.

*Id.* ¶ 42.

52.     Procter & Gamble ("P&G"), the multinational consumer goods company based out of Cincinnati, Ohio, has also made public statements denouncing Tesco's misconduct.  To that end, David Sables, a former P&G negotiator, columnist for The Grocer magazine, and now CEO of his own management consulting business in London, publicly reported that Tesco investors had been "hoodwinked" by Tesco's actions: "Tesco deceived the financial markets on their performance and subsequent market capitalisation by dodgy accounting.  Investors have been hoodwinked."[7]  On October 17, 2014, Mr. Sables was quoted as saying "Tesco has asked for alarmingly increasing amounts and frequencies for support and promotional bonus money to come in early, saying that it will be accrued until the correct later period."  The former P&G negotiator with Tesco went on to state that Tesco had "a standard endemic practice to fudge the numbers at a period end . . . ***accounting as a grey art form***."

### ii.     Potato Supplier

53.     CW1 was one of the largest potato suppliers to Tesco in Ireland, and entered into a written agreement with Tesco to supply a large proportion of all potatoes sold from Tesco's

---

[7] *See* Chris Warmoll, *Tesco's fall from grace compounded by accounting blunder* (Oct. 17, 2014), http://www.financialdirector.co.uk/financial-director/analysis/2375123/tescos-fall-from-grace-compounded-by-accounting-error.

stores in Ireland.  According to CW1, Tesco would regularly issue invoices to his company for purported services that were never provided.  CW1 refused to pay these invoices and Tesco never asserted that the supplier was legally obligated to pay.

54.     Tesco knew the invoices were bogus as they had been fabricated to inflate reported expected future income and related receivable in its financials.  In Tesco's Loss Update, dated April 22, 2015, Tesco admitted that what was included as commercial income was "[a]mounts that have been invoiced to suppliers but not yet received."  Loss Update at 8. Tesco's manipulation of commercial income during the Relevant Period was later revealed to be £326 million (half a billion dollars).

### iii.     Sports Drink Supplier

55.     CW2 and CW3 worked together as suppliers of a popular sports drink to Tesco during the Relevant Period and experienced Tesco's fabrication of commercial income. Specifically, CW2 normally sold cases of his company's sports drink for £14 per case, with 14 units of the sports drink in each case, and the grocery store (*i.e.* Tesco) selling individual units of the sports drink at £1 each.  However, Tesco demanded special treatment because it offered to carry the sports drink in 150 stores in exchange for the supplier's sale price per case being reduced £3 to £11 per case.  CW2 reluctantly agreed and the sports drink was subsequently placed in 150 Tesco stores.

56.     In June/July 2014, CW2 received a £27,000 invoice for listing fees for the sports drink being listed in the 150-plus Tesco stores.  CW2 never agreed to such a back-end payment and thus refused to pay the invoice.

57.     In October 2014, CW2 received an email from Tesco, requesting that CW2 provide two new flavors of the sports drink.  However, Tesco demanded an additional £25,000

listing fee. CW2 never agreed to pay such a high price to launch his product.

58.     Nevertheless, in November 2014, CW2 received a second invoice for purported listing fees. CW2 then received a third invoice for £6,000 for undisclosed reasons, which CW2 believes was for "bar codes" which amount to small strips of paper with "New" on it to promote certain products. While CW2 had a discussion with a Tesco representative about the "bar codes" promotion, CW2 never agreed to it.

59.     CW2 refused to pay the invoices and the sports drink supplier stopped selling product to Tesco in January 2015.

60.     After a new management structure was put into place at Tesco, CW3 attended a marketing convention. A Tesco employee named David Beardmore, who is a Category Buying Manager for Tesco based out of the UK for soft drinks and juice, saw CW3 and approached him at this conference. Mr. Beardmore and CW3 had a conversation about CW3's sports drink, where Mr. Beardmore apologized for Tesco's prior behavior and stated that Tesco was interested in carrying CW3's sports drink on its shelves once again without the bogus up-front fees. CW3 had subsequent meetings with other Tesco executives at Tesco's headquarters in Cheshunt who expressed a similar apologetic sentiment.

### iv.     Vegetable Supplier

61.     Tom Salmon, former managing director of Hedon Salads, one of Tesco's key producers of aubergines, tomatoes, cucumbers and peppers recalled to Rupert Steiner of the Daily Mail how Tesco would pressure suppliers.[8] Salmon experienced first-hand the Tesco-supplier relationship and, he offered his account because he believed his "story may help in some

---

[8] *See* Rupert Steiner, *'Tesco's Bullying Tactics Mean You Have To Pay Them!' Supplier Tells of Harsh Treatment By Britain's Biggest Supermarket Chain,* DailyMail.com (Oct. 23, 2014), http://www.dailymail.co.uk/news/article-2804406/Tesco-reveals-profits-fallen-91-CENT.html.

way explain what suppliers have gone through and give a slightly different perspective on the

demise of Tesco." According to Salmon, Tesco began changing the way it did business in 2002,

but "[a]s time went by these charges became more onerous, first it was to pay for new quality

ideas" but it became increasingly worse. For example, "when items are discounted … from £9 to

£5, it is the suppliers who pay the £4 difference," and suppliers "also pay to place their items on

the best positions on the shelves." Then, Salmon said: "My company also had to face a wave of

supplementary charges." Salmon recalled one specific example:

> We had to buy all our packing from a stated supplier from which Tesco took a roll
> [a cut] off the top. The worst case was in 2010 when the weather in Southern
> Spain was so bad that salad produce was very short. We could not supply
> aubergines for two weeks and the result was Tesco fined us £45,000 for loss of
> profit. We declined the fine and said we would not pay, they promptly took the
> money from our account that they owed us.

62.     Mr. Salmon summed up the Tesco-supplier relationship as follows: "If you want

to supply Tesco you have to pay. As the years went by the charges became more unreasonable,

the buyer's profit margin was down and he or she was not going to make their bonus." He went

on to say that when he retired, he "felt that the Tesco bubble was starting to burst. Suppliers

could not go on supplying like this. It had become impossible to service Tesco with all these

add-on costs and demands."

63.     As Tesco demanded increasingly unreasonable concessions, the suppliers refused

to pay. This resulted in the booking of commercial income that had not been earned. Mr.

Salmon stated in another report that Tesco engaged in "inappropriate behaviour" and provided

information suggesting "a small group of executives" at Tesco entered into side-deals to smooth

earnings and that Tesco relied on "opaque and arbitrary side deals" to inflate earnings.

## II.    TESCO'S MASSIVE RESTATEMENT OF FINANCIAL RESULTS

### A.    September 2014 Disclosure

64.    On September 22, 2014, Tesco shocked investors by disclosing that it was withdrawing its previously reported financial results for the first-half of 2014 (for the six months trailing August 23, 2014), announcing that the Company had "identified an overstatement of its expected profit for the half year" of approximately £250 million ($400 million) that was due to "accelerated recognition of commercial income and delayed accrual of costs."  This amounted to a **23% overstatement of Tesco's profits**, which were previously reported as £1.1 billion.

65.    In announcing the restatement, Lewis described the accounting manipulations as a "serious issue," and immediately suspended four senior executives, including the head of the Company's UK business, Chris Bush.  Lewis revealed that the Company only disclosed the £250 million "error" after a whistleblower provided a detailed report of the accounting violations to the Company's general counsel.  According to Lewis, "[t]he person who had done the report [detailing the accounting manipulations] had obviously done some work and had a whole view as to how big the number was.  It was a reasonably senior person and, given their position in the business, they had the access to find out."  Tesco's newly-installed CEO said that he had never seen revenue accounted for in the way Tesco had done in this case in his prior 27-year career at Unilever, explaining that such accounting was "[c]ertainly not [done] in my Unilever career."

66.    Tesco's longtime auditor, PricewaterhouseCoopers LLP ("PwC"), had cryptically flagged the accounting practices that led to the massive overstatement in the Company's 2014 Annual Report concerning Tesco's financials for the 2013/14 fiscal year.  Specifically, PwC noted in the Company's Annual Report that "[w]e focused on this area because of the judgement required in accounting for the commercial income deals and the risk of manipulation of these

balances."  This disclosure was so cryptic that only an insider could have concluded that PwC

had discovered Tesco's improper booking of commercial income.  An outside investor could not

have assessed the negative implications of Tesco's failure to properly account for commercial

income based on this disclosure.  Despite PwC's reported focus on commercial income, the

Company's Audit Committee reassured investors of the validity of its reported financial results,

specifically the validity of its commercial income based on the purported "appropriate control

environment in place" which consequently alleviated Tesco, in its eyes, from making the

necessary disclosures:

> The Committee notes that commercial income was an area of focus for the
> external auditors based on their assessment of gross risks.  It is the Committee's
> view that *whilst commercial income is a significant income for the Group and
> involves an element of judgement,* **management operates an appropriate control
> environment which minimises risks in this area**.  As a result, **the Committee
> does not consider that this is a significant issue for disclosure** in its report.

67.    On May 11, 2015, the Company reported that PwC, Tesco's auditor for more than

30 years, was being replaced by Deloitte LLP.

68.    Analysts and investors were stunned at the size of the misstatement.  Analysts at

Deutsche Bank called the £250 million "overestimation" "disturbing," noting that it represented

nearly a quarter of previously reported profit (EBIT) guidance of £1.1 billion.  Analysts at Shore

Capital were more blunt, exclaiming that they were "flabbergasted" by the massive

misstatement, with Bernstein Securities analysts calling the accounting irregularities "huge in

scale."  Analysts at Citibank questioned Tesco's failure to disclose commercial income in its

2014 Annual Report when its own auditor, PwC, identified commercial income as an area with a

"risk of manipulation."  Citibank analysts found Tesco's non-disclosure of commercial income

"particularly interesting" in light of the Company's Audit Committee's responsibilities.

69.    Along with the commercial income manipulation, analysts also took issue with

Tesco's improper "delayed accrual of costs." On September 22, 2014, Forbes published an article entitled "Tesco's Accounting Irregularities Are Mind Blowing," stating that "the only way Tesco could have 'delayed booking of costs' is by not entering invoices into its accounting systems. In today's world of electronic invoicing, that's not easy to do, and had to be consciously managed." On that same day, HSBC analyst David McCarthy, who the BBC notes is "so highly rated that even Tesco's management speak of him in glowing terms,"[9] stated that "it is unclear whether the real underlying level of profits has yet been found." He further noted that slowing sales growth at Tesco contributed to its inaccurate calculations, saying "[w]e suspect Tesco may have been booking promotional rebates based on historic precedent rather than on current volumes."[10] To this day, Tesco has failed to explain the meaning or context of its "delayed accrual of costs," let alone provide any dollar figure or estimate of its impact on Tesco's reported financials.

70.     On September 23, 2014, Reuters published an article stating that "Tesco Plc's disclosure of huge accounting mistakes over contracts with its suppliers shocked industry analysts and executives." The article further provided that the "revelation on Monday that it had overstated its profits forecast for the first half of the year by 250 million pounds . . . came as a nasty surprise and wiped 2 billion pounds off its stock market value."

71.     In another article published on September 23, 2014, *The Guardian* reported that Chris Bush, a trusted employee with a 32-year tenure, who was integral to Tesco's financial statement preparation, was involved in activities over business costs that are "thought to centre

---

[9] *See* Kamal Ahmed, *Tesco's Chairman 'shocked' by accounts mess*, BBC News (Sept. 22, 2014), http://www.bbc.com/news/business-29318332.

[10] *See* Paul Murphy, *How to (further) spook a grocer, HSBC edition*, FT Alphaville (Sept. 22, 2014), http://ftalphaville.ft.com/2014/09/22/1979432/.

on figures booked for food that is out of date, and stock theft."  On September 27, 2014, the

*Sunday Telegraph* reported that a senior source told the paper that a "corruption of virtues" had

made people "go over the lines that basic values suggest they shouldn't have."

72.     In response to these disclosures, the Company's ADRs fell nearly 15%, declining

from $11.29 on September 19, 2014 to close at $9.61 per share on September 22, 2014.

**B.     October 2014 Disclosure**

73.     The Company's shares continued to decline following additional revelations of

the fraud.  On October 1, 2014, the Company disclosed that the UK's FCA was conducting a

full-scale investigation into the Company's accounting irregularities.  On October 7, 2014, Tesco

announced that Commercial Director Kevin Grace had been fired, and on October 14, the

Company fired three more executives as the investigation continued.

74.     On October 23, 2014, Tesco disclosed that the investigation by Deloitte had

revealed that the profit overstatement of commercial income previously estimated as £250

million was actually £263 million ($400 million).  Deloitte further confirmed that the accounting

improprieties disclosed were "contrary to Tesco Group accounting policies."  This revelation

contradicted the Company's previous statements that Tesco's financial reporting were properly

undertaken in accordance with Tesco's accounting policies and procedures.

75.     Tesco's overstatement involved improper recognition of commercial income and

costs from its UK suppliers, as well as the Company's treatment of extra incentives - often called

"rebates" - that Tesco received from suppliers for hitting certain levels of sales or for supporting

promotions.  According to Tesco, these same practices had occurred in prior periods.

Specifically, the Company reported that, of the £263 million overstatement, £70 million reflected

inflated profits for the fiscal year ended February 22, 2014, £75 million was attributable to prior

years (£145 million total for February 2014 and prior), and profits were inflated by £118 million

in the first half of fiscal year 2014/15, as follows:

|  | Total | Pre-2013/14 | 2013/14 | 1H 2014/15 |
|---|---|---|---|---|
| **Commercial Income Overstatement** | £263 mm | £75 mm | £70 mm | £118 mm |

76.     That same day, Chairman Sir Richard Broadbent announced his resignation,

telling investors that he was "deeply disappoint[ed]" about the accounting irregularities, calling

the developments a "matter of profound regret."  He further stated that his resignation "reflects

the important principle of accountability."  Broadbent was ultimately replaced by John Allan,

former Chairman of the UK retailer Dixons Retail plc, as Chairman of Tesco's Board on March

1, 2015.

77.     In all, at least ten senior Tesco executives have been removed from their

positions, including its Chairman (Richard Broadbent), CEO (Phillip Clarke), CFO (Laurie

McIlwee), and UK Managing Director (Chris Bush).  Also forced to resign were Kevin Grace,

the former commercial director; Carl Rogberg, the ex-UK finance director; John Scouler, the

former UK food commercial director; Dan Jago, the former UK head of beer, wine and spirits;

William Linnane, the former UK impulse category director; Sean McCurley, the former UK

director of convenience; and Matt Simister, the head of UK food sourcing.  According to a

December 1, 2014 article in *The Telegraph*, Matt Simister was asked to return to the Company

after an internal investigation revealed that Mr. Simister had purportedly "worked tirelessly to

resolve the issues we faced."

78.     Tesco has admitted it is now in the process of "rewrit[ing] the rules" about its

business in order to bring the Company into compliance with the law.  In fact, on an October 23,

2014 conference call, Lewis promised that the Company would, going forward, make it "really

clear for our people about how it is we want them to use their judgment around commercial income, and we've retrained them so that we don't leave anything to question," and that this "retraining" was being done "across our business."  As Lewis explained, the Company needed to undergo a "catalytic" "change in culture" to win back investors' trust, promising that "we will change . . . the way that we report" the Company's financial results in a way "that you can track, like we would, exactly how we're doing against the investment case that we make."  In other words, Lewis promised the Company would only now begin to provide the transparency and disclosure to investors that the Company had falsely represented it provided in the past.

79.  In October 2014, Tesco's fraudulent accounting became the focus of an investigation by both the UK's financial regulatory body, the FCA, the UK's taxing authority, the HMRC, as well as a criminal investigation by the UK's SFO, the governmental entity responsible for investigating serious or complex fraud.

80.  After Tesco's October 2014 disclosures, Warren Buffett, whose Berkshire Hathaway fund lost approximately $444 million from its investment in Tesco, likened Tesco's accounting fraud to "cockroaches in your kitchen."  In his letter to shareholders concerning Tesco's accounting misstatements that surfaced throughout 2014, Buffett wrote: "In the world of business, bad news often surfaces serially: you see a cockroach in your kitchen; as the days go by, you meet his relatives."

81.  In response to these new disclosures, Tesco ADRs declined another 6%.  In all, revelations of the accounting irregularities and the Company's true financial condition have caused Tesco's ADRs to lose approximately one-half of their value, with the ADRs dropping from a high of over $18 in September 2013 to close at $8.18 per ADR on October 23, 2014, *a 55% decline*.

82.     On December 17, 2014, J.P. Morgan issued a report on Tesco that indicated that the Company's overstatement of profits may have even been greater than previously reported. By J.P. Morgan's calculations, Tesco's restatements "still leaves a *gap of £174mn, which compares with an average gap of £28mn in the previous seven years.*"  Apparently, Tesco recognized the gap, but failed to give any explanation for it:

> We asked the company, and they did not provide any further details but they noted that this difference might be explained by the fact that we are comparing an IFRS Trading Profit with a UK GAAP operating profit and that there may be intra company adjustments.
>        . . .
> We are unable to explain the full gap between the Compan[y's] House EBIT and the reported UK trading profit of 2013/14.  Regardless of what the exact UK profit was in 2013/14, it seems clear to us that Tesco's results are being hit by the unwinding of supplier rebates as volumes fall, hence the need to reset the framework with suppliers.  We remain cautious on Tesco and the rest of the UK sector.

83.     Even Tesco's old CEO criticized Tesco for the ongoing revelations of Tesco's mismanagement.  On January 19, 2015, Sir David Leahy, the CEO of Tesco prior to Phillip Clarke, stated in an interview with the BBC that the recent revelations concerning the Company constituted "a failure of leadership, not a failure of the business."

84.     On February 5, 2015, the UK Groceries Code Adjudicator, the UK government entity responsible for enforcing compliance with the Groceries Supply Code of Practice, announced a formal investigation based on a "reasonable suspicion that the [Groceries Supply Code of Practice] has been breached by Tesco plc by some of its practices associated with the profit over-statement announced by the company in September 2014."  This is the first investigation ever instituted by the Groceries Code Adjudicator, Christine Tacon, who stated that she has evidence that Tesco's conduct "were not isolated incidents, each involving a number of suppliers and significant sums of money."  The conduct under investigation includes: (i)

imposition of penalties for short deliveries; (ii) unilaterally-declared amounts of consumer complaints; (iii) delays in payments based on claims of being double-invoiced; (iv) unknown deductions from payments; (v) incorrect payment deductions for promotions ("gate fees"); and (vi) unilateral, disputed deductions for past promotions. As explained below in Section II(D), Tesco later admitted to "probable" breaches of the UK Groceries Supply Code of Practice.

### C.    April 2015 Disclosure

85.    On April 22, 2015, Tesco once again revised and increased its earlier reported commercial income overstatement to £326 million ($500 million) overall. Specifically, Tesco reported that the overstatement of commercial income, which was previously reported as a £145 million ($220 million) overstatement for February 22, 2014 and prior, was increased to £208 million ($315 million). Of the £326 total overstatement, £118 million ($180 million) was attributable to the first half of 2014/15, £53 million ($80 million) was improperly recorded in 2013/14, and £155 million ($235 million) was improperly recorded in 2012/13 and prior. Accordingly, the revised commercial income overstatement by Tesco can be summarized as follows:

|  | Total | 2012/13 | 2013/14 | 1H 2014/15 |
|---|---|---|---|---|
| **Commercial Income Overstatement** | £326 mm | £155 mm[11] | £53 mm | £118 mm |
| **Reported Profit for the Period** | £5,563 mm | £2,272 mm | £2,191 mm | £1,100 mm |
| **Adjusted Profit for the Period** | £5,237 mm | £2,117 mm | £2,138 mm | £982 mm |
| **Error as Percent of Adjusted Profit** | 6.2% | 7.3% | 2.5% | 12.0% |

86.    Tesco indicated in this April 2015 disclosure that it was reducing the impact of

---

[11] While Tesco reported this £155 million amount to an undefined period of "pre-2013/14," this amount can likely be accounted for in the 2012/13 reporting period, as illustrated in the table.

commercial income on its bottom line going forward. Tesco reported a "fundamental change to the way we do business with our suppliers, with *significantly less focus on commercial income, [which has] further impacted profitability*." Tesco also reported for the first time on what was included in Tesco's designation of commercial income, including "[a]mounts that have been invoiced to suppliers but not yet received."

87.     In addition, the Company reported a £6.38 billion ($9.68 billion) loss for the year ended February 28, 2015, the largest one-year loss in the Company's or any British retailer's history. This £6.38 billion *record loss* contrasts with the Company's reported £2.26 billion *profit* the year before and a purported £3.8 billion *record profit* for 2011-2012. The majority of the loss was attributable to a £4.7 billion impairment of fixed assets.

88.     This massive impairment was triggered in large part by the recognition of the declining profits at the retailer which had only recently come to light, which in turn made Tesco property significantly less valuable. According to Tesco, the "impairment charge of £(4.7) bn ensur[es] [that the] impact of challenging industry conditions and *profit decline* are reflected on balance sheet." In other words, the Company's manipulation of commercial income and profits over the past several years was partially responsible for the most massive impairment of assets in the Company's history, representing another massive blow to the value of the Company and in turn, the value of Company stock.

89.     On a call with reporters on April 22, 2015, the same day as the new revelations by the Company, Tesco CEO Dave Lewis said that Tesco's approach to commercial income had become "motivated by profit rather than serving customers," which had "clouded our focus." One of the three new "priorities" announced by Tesco was "[r]ebuilding trust and transparency."

90.     On April 22, 2015, Lewis and new CFO Allan Stewart also held a press

conference with analysts to discuss the new financials. At the press conference, Stewart confirmed that after a more fulsome audit, the £145 million overstatement of Tesco's reported commercial income for prior years was actually £208 million. In terms of Tesco's prior use of commercial income as a means to "close a profit gap," Lewis recognized that this was improper:

> We had 24 different ways of generating accounting for commercial income. That's a lot. We think it's too many, we think it's too complicated. We think it potentially leads to some of the ***wrong behavior***. ***I've said it publicly before. I think if commercial income is focused on closing a profit gap you lose some of the purpose of what it was designed for in the first place***.

91.     In light of the prior commercial income overstatements, Lewis emphasized a new code of conduct for Tesco employees concerning the reporting of commercial income in order to build trust and transparency:

> We've done a lot since we've met . . . in terms of redefining what it is, how it is, we expect people and colleagues within Tesco to behave. So everybody, new code of conduct, March of this year. ***In the commercial area, very specific new guidance and training around commercial income and how it is we want to recognize and how it is we want to deal with our supplier base***.

92.     Stewart also recognized that the false overstatement of Tesco's commercial income in the past which led to its perpetual overstatement in subsequent periods (*i.e.* fraud) would no longer be tolerated going forward:

> [I]t's a good question in terms of the commercial income. And, look. There are judgments involved in trying to break things out because you can always put them into different areas. I think for us, the important thing is that the base was too high and we've adjusted that. . . . ***Now we all know that when one gets into those sorts of activities, wherever they are in a business, the next year it has to be bigger. So we've stopped that and we've taken it away***.

### D.     2015 Annual Report Disclosure

93.     On May 21, 2015, Tesco released its 2015 annual report for the 2014/15 fiscal year (for the 53 weeks ended February 28, 2015). In this report, the Company admitted to wrongdoing concerning its reporting of commercial income, stating "[w]e rely on the trust

customers, suppliers, communities and shareholders place in us. ***Regrettably, this trust has been undermined, following the commercial income issue identified in September*.**"

94.     Even the Chairman of the Board expressed "sincere regret" for the "commercial income issue":

> On behalf of the Board, I would like to express **sincere regret for the impact of the commercial income issue on this company**, and would like to assure you that we have moved swiftly and decisively to address this serious matter.

95.     Tesco also specifically admitted that its prior misconduct constituted "probable breaches" of UK's Groceries Supply Code of Practice, which has led to a retraining of Tesco personnel to make themselves Code compliant (for the first time):

> ***Regrettably***, **we have concluded that there have been a number of instances of probable breaches of the Code** which fall short of the high standards we expect to uphold in our dealings with our suppliers.
>
> *We are taking effective action to prevent this arising again*. We are fundamentally changing the way we work with our suppliers to deliver a more sustainable and collaborative business model for everyone in the supply chain. In addition, we are *significantly up-weighting our Code compliance programme*. The programme will include comprehensive new starter training and annual refresher training (which is delivered through both e-learning and in-person training), improved guidance and processes, 'deep dive' audits throughout the year, bi-annual compliance declarations and disciplinary action where necessary.

96.     In the report, Tesco also admitted that it failed to properly allocate the £208 million in losses for "prior years" with respect to specific time periods.  Instead, Tesco stated in its 2015 Annual Report that it was merely accounting for the corrected financials in the current fiscal year, but at the same time reporting that such losses should not reflect (negatively) on its "current year performance":

> On the basis that these figures are not material in the prior years, a prior year restatement has not been made with the amounts instead being corrected in the current year. The impact of this has been separately identified in the reconciliation of profit before tax to underlying profit above as the correction does not reflect current year performance.

97.     In addition, Tesco's reported £6.4 billion record loss for 2014/15 was largely attributed to a multi-billion pound write-down of the value of its fixed assets.  This write-down was defined, conveniently, as a "one-off" and was largely attributed to the over-reporting of revenue generation from its Tesco stores, which in turn made the properties significantly less valuable.  In the April 2015 Disclosure concerning the preliminary results for 2014/15, Tesco reported a £4.7 billion "fixed asset impairment," while in its restated financials, Tesco reported a slightly reduced £4.3 billion "impairment of property, plant and equipment and investment property."  Nevertheless, Tesco's impairment was massive, both in terms of the actual figures reported, and in relation to the prior value for Tesco property as illustrated below:

| TESCO'S PROPERTY IMPAIRMENT (Group Operations) | | |
| --- | --- | --- |
| | **April 2015 Disclosure** | **2015 Annual Report** |
| **2013/14 Reported Tesco Property Value** | £24,717 mm | £24,717 mm |
| **Impairment of Tesco Property** | £4,727 mm | £4,313 mm |
| **Adjusted Tesco Property Value** | £19,990 mm | £20,404 mm |
| **Impairment as Percent of Adjusted Property Value** | **23.6%** | **21.1%** |

98.     Tesco's impairment of fixed assets was even more pronounced when focused on the Company's UK property:

| TESCO'S PROPERTY IMPAIRMENT (UK Operations) | | |
| --- | --- | --- |
| | **April 2015 Disclosure** | **2015 Annual Report** |
| **2013/14 Reported Tesco Property Value** | £13,696 mm | £13,696 mm |
| **Impairment of Tesco Property** | £3,071 mm | £3,071 mm |
| **Adjusted Tesco Property Value** | £10,625 mm | £10,625 mm |
| **Impairment as Percent of Adjusted Property Value** | **28.9%** | **28.9%** |

III.   **TESCO'S FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS**

A.   **Interim Results for 2011/12**

99.   On October 5, 2011, the Company disclosed its Interim Results for 2011/12 (for the 26 weeks ended August 27, 2011).  Tesco reported the following in the report:

- Group sales up 8.8% to £35.5bn
- 6.2% rise in underlying profit before tax to £1.9bn
- 12.1% increase in statutory profit before tax to £1.9bn
- 3.7% growth in Group trading profit to £1.8bn
- 4.5% UK trading profit growth

100.   CEO Phillip Clarke expounded on the financial results, stating that he was "pleased that excellent growth in Europe and Asia . . . have supported further progress in the first half, despite the challenges of subdued demand in the UK, particularly in non-food categories."

101.   Statements in the Interim Results were materially false and misleading because any purported "growth" or "progress" in Tesco's financial results were in fact driven by Tesco's improper recognition of commercial income and delayed accrual of costs.  Moreover, Tesco admitted in its 2015 Annual Report that it overstated commercial income by £155 million pre-2013/14.

B.   **Third Quarter Interim Management Statement for 2011/12**

102.   On December 8, 2011, the Company disclosed its Third Quarter Interim Management Statement for 2011/12 (for the 13 weeks ended November 26, 2011).  In the report, Tesco reported that Group Sales for the period had increased by 7.2%.  Philip Clarke touted the progress made in Tesco's "Big Price Drop Campaign" to compete with the discount retailers, stating "[i]n the UK, our increased investment in the shopping trip for customers is starting to deliver.  The Big Price Drop campaign, now in its second phase, has lowered prices significantly for hard-pressed families and we are now being rewarded with stronger food volume growth."

33

103.    Such statements were materially false and misleading because Tesco later admitted that any "reward" that Tesco was purportedly realizing was the result of its overstatement of commercial income.  Indeed, Tesco later admitted that its financials for the larger period, including 3Q 2011/12, overstated commercial income by £155 million.

### C.    Preliminary Results for 2011/12

104.    On April 18, 2012, the Company disclosed its Preliminary Results for fiscal year 2011/12 (for the 52 weeks ended February 12, 2012).  Tesco reported the following "financial headlines" in the report:

- Group sales up 7.4% to £72.0bn
- Statutory profit before tax up 5.3% to £3.8bn; underlying profit before tax up 1.6% to £3.9bn
- Group trading profit up 1.3% to £3.8bn
- Financial strategy to put increased focus on delivering sustainable business growth, improving returns and higher level of cash generation

105.    Tesco also announced the start of the "Build a Better Tesco" program for the first time, which was intended to "refresh[]" 430 stores in 2012/13, involving a £1bn capital commitment.  The new initiative focused on six key elements:

i.      Service & Staff – more staff for existing stores, initially in fresh food departments

ii.     Stores & Formats – faster store Refresh programme; introducing warmer look and feel

iii.    Price & Value – better prices and promotions, more personalised offers

iv.     Range & Quality – better ranges, starting with re-launching the Tesco brands

v.      Brand & Marketing – better, clearer, more relevant communication with customers

vi.     Clicks & Bricks – Click & Collect roll out, transforming range and online presence

106.    CEO Phillip Clarke expounded on the new Build a Better Tesco initiative:

[W]e fully recognise that we need to raise our game in the UK.  As a result, we are committing over £1 billion to make the UK shopping trip better for customers; more staff giving improved service in-store; refreshed stores that are better and

easier places to shop; lower prices and even more value from an improved
product range.  As we improve the shopping trip for our customers, it will follow
that our sales growth and financial performance will improve too.

107.  Such statements were materially false and misleading because any increase in

Tesco profits was primarily the result of Tesco's overstatement of income and delayed accrual of

costs, which Tesco later admitted took place during this period.  Indeed, Tesco later admitted that

its financials for the larger period, including the 2011/12 fiscal year, overstated commercial

income by £155 million.

**D.    First Quarter Interim Management Statement for 2012/13**

108.  On June 11, 2012, the Company disclosed its First Quarter Interim Management

Statement for 2012/13 (for the 13 weeks ended May 26, 2012).  The Company reported that

group sales for the period had increased 2.2%.  Tesco reported the following progress on its new

"Build a Better Tesco" strategy:

- Solid Q1 trading performance and good progress on our strategic priorities
- UK performance in line with expectations, and an improvement relative to the market
- Steady progress with Building a Better Tesco in the UK

109.  CEO Clarke touted the "robust[]" "perform[ance]" of its financial results against

"the backdrop of continuing uncertainty in the Eurozone," making it "pleasing to see that our

businesses have largely sustained their performance."

110.  Such statements were materially false because the purported "robust

performance" that Tesco enjoyed was a product of Tesco's overstatement of commercial income

and delayed accrual of costs during the period, which Tesco later admitted.  Indeed, Tesco

admitted that its financials for the larger period, including 1Q 2012/13, overstated commercial

income by £155 million.

### E.     Interim Results for 2012/13

111.     On October 3, 2012, the Company disclosed its Interim Results for 2012/13 (for the 26 weeks ended August 25, 2012).  Tesco reported the following concerning its implementation of the Build a Better Tesco initiative:

- Group sales up 1.4% to £36.0bn
- UK plan implementation underway, with improvements in UK sales performance, including like-for-like sales growth in second quarter
- Our £1bn investment programme to improve the shopping trip for customers is on schedule, with tangible investments in all elements of the plan

112.     In the UK, Tesco reported "improved like-for-like sales performance [which] benefit[ted] from a more competitive offer."  As such, Tesco reported the following financial growth out of the UK:

- UK sales up 2.2% to £23.9 billion
- UK revenue up 2.1% to £21.6 billion

113.     CEO Clarke stated that he was "encouraged by our customers' initial responses to the changes we have made" since implementing the Build a Better Tesco initiative in April 2012.

114.     Such statements were materially false because any improvement of sales and revenue figures or other purported improvements in Tesco's financials for the period were not the result of the customers' response to the Build a Better Tesco program, but instead were the result of Tesco's overstatement of commercial income and the delayed accrual of costs.  Indeed, Tesco later admitted that its financials for the larger period, including the first half of 2012/13, overstated commercial income by £155 million.

### F.     Third Quarter Interim Management Statement for 2012/13

115.     On December 5, 2012, the Company disclosed its Third Quarter Interim Management Statement (for the 13 weeks ended November 24, 2012).  In the statement, Tesco continued to report that the Build a Better Tesco program was "showing further progress" and

36

causing improvements in Tesco's financials.  CEO Clarke stated that he was "pleased with the performance of our food business in the UK" which was purportedly driving improvements in Tesco's business.  Accordingly, Tesco reported that UK sales increased by 1.7%, while Group sales for the period increased 2.4%.

116.    Such statements were materially false and misleading because any "progress" being shown in Tesco's financials during the period were the result of Tesco's overstatement of commercial income and delayed accrual of costs, not the success of Build a Better Tesco. Indeed, Tesco later admitted that its financials for the larger period, including 3Q 2012/13, overstated commercial income by £155 million.

### G.    Preliminary Results for 2012/13

117.    On April 17, 2013, the Company disclosed its preliminary year-end financial results for 2012/13 (for the 52 weeks ended February 23, 2013).  Tesco reported £3.50 billion ($5.31 billion) in annual trading profits, with UK revenues of £43.09 billion ($65.41 billion) and UK trading profit of £2.27 billion ($3.45 billion).   With respect to its UK business, the Company explained:

> Our planned investment to 'Build a Better Tesco' has delivered an improved performance, despite trading conditions for the market as a whole remaining difficult throughout the year. Consumer confidence remained very low and customers continued to manage household budgets carefully in the face of high inflation. Despite this, our underlying performance significantly improved throughout the year, led by a much stronger performance in food - the main focus of our efforts to date.

118.    Tesco disclosed its preliminary sales and profit figures in the UK for 2012/13 as follows:

- UK sales up 1.8% to £48.2 billion
- UK revenue (exc. VAT) up 1.8% to £43.6 billion

119.    The Company further stated that these results were "in line with the guidance

given at our Preliminary Results in April last year" and that it believed "this level of margin is

sustainable and appropriate for the foreseeable future."

120.    The Company also reported that the fourth quarter delivered the "strongest level

of like-for-like sales growth [in the UK business] . . . for three years," explaining that the

Company's results were "driven by a market-leading performance through the important

Christmas & New Year period and was achieved despite a tougher comparative base as we

lapped the exceptionally high levels of couponing activity undertaken in early 2012."

121.    Thus, while Tesco's reported profits declined from the prior year -- and were

negatively impacted by £1.2 billion in losses stemming from the Company's decision to exit its

U.S. Fresh & Easy business and write-downs of the Company's UK properties -- investors were

reassured that the Company was poised to return to profitability and growth.  As Defendant

Clarke explained:

> Our plan to 'Build a Better Tesco' is on track and I am pleased with the real
> progress in the UK. We have already made substantial improvements to our
> customers' shopping experience, which are starting to be reflected in a better
> performance.
>
> We have set the business on the right track to deliver realistic, sustainable and
> attractive returns and long-term growth for shareholders. The consequences are
> non-cash write-offs relating to the United States, from which we today confirm
> our decision to exit, and for UK property investments which we will not pursue
> because of our fundamentally different approach to space. . . . Our focus now is
> on disciplined and targeted investment in those markets with significant growth
> potential and the opportunity to deliver strong returns.

122.    Such statements were materially false and misleading because Tesco later

admitted that the financials for the period of February 22, 2014 and prior, including fiscal year

2012/13, overstated commercial income by £155 million.  Accordingly, the profit and revenue

figures for the period were not the result of "progress" with the Build a Better Tesco plan, but

instead were based upon Tesco's manipulation of its financials.

H.    **2013 Annual Report**

123.    In its 2013 Annual Report published on or around May 1, 2013 concerning

Tesco's financials for 2012/13 (for the 52 weeks ended February 23, 2013), the Company

repeatedly touted its "Build a Better Tesco" program in the UK.  Under the "Build a Better

Tesco" program, the Company emphasized its focus on its intent to "grow the UK core" which

they "expect . . . to continue delivering stronger like-for-like sales [next year] in 2013/14."

124.    In the report, CEO Clarke touted the early returns being realized from the "Build

a Better Tesco" program:

> A year ago we announced a plan to 'Build a Better Tesco' in the UK. In last
> year's Annual Report I described how getting our business at home back to
> leading was the single most important objective for Tesco. Having grasped the
> nettle and decided to reinvest in the UK business in early 2012, we have seen a
> pleasing response from customers – and consequently the performance of the
> business is now markedly better. The 'Building a Better Tesco' plan is firmly on
> track.

125.    Clarke also stated that over the past 18 months, Tesco had "[r]eviewed our entire

UK property pipeline to ensure it is appropriate for our future needs and valued accordingly."

126.    Tesco repeatedly flaunted its positive relationship with suppliers in the report:

- Our embedded Group Code of Business Conduct and Bribery Act Guidelines
  guide our behaviour in dealing with customers, employees and suppliers.

- We were just behind our stretching target of 74% [for "Supplier Viewpoint"] and
  we are confident that we have good plans in place to improve our performance in
  2013/14 and beyond.

- We know that we will only succeed if we have strong relationships with our
  suppliers.  We are launching a new Commercial Food Support Office and
  simplifying our systems to make it easier for suppliers to do business with us.  We
  will work more closely with suppliers to develop joint business plans and
  recognise success through our Supplier Values Awards.

- **Supplier payment policy** Tesco PLC is a signatory to the Prompt Payment Code
  in the UK.

127.    In order to protect against "reputational risk," the Company touted its "Tesco

Values [that are] embedded in how we do business at every level" and that "[g]overnance committees, including Executive, Group Commercial, Corporate Responsibility, Social Responsibility, Compliance and Information Security Committees, guide and monitor policies."

128.    In the Annual Report, Tesco listed the "[f]raud, compliance and internal controls" in place to, among other things, protect against "the potential for fraud and dishonest activity by our suppliers, customers and employees":

- ***Appropriate procedures and controls including Group Accounting Policy, key financial controls, IT access controls and segregation of duties are set out across the business to reduce fraud risks***

- ***Compliance Committee monitors implementation of, and compliance with, relevant policies and procedures***

- An annual governance return is completed by each business unit

- Clear behavioural guidance given to employees through training on Tesco Values, the Group Code of Business Conduct, the UK Bribery Act and our Whistleblowing service – Protector Line

- ***Internal Audit undertakes risk-based programmes and detailed investigations into all business areas and reports its findings to the Audit Committee***

- ***Group Loss Prevention & Security monitors fraud, bribery and business continuity across the Group and reports its findings to the Audit Committee***

- Store and distribution compliance and technical law and trading reviews conducted regularly to reinforce compliance across the estate

- Information Security Committee regularly reviews IT incidents

- External Audit rotational coverage of areas and assessment of controls

129.    The 2013 Annual Report further stated that the Tesco Board of Directors "have general responsibility for taking such steps as are reasonably open to them to safeguard the assets of . . . the Company and to prevent and detect fraud and other irregularities."

130.    It also reported "[c]ompliance with the Groceries (Supply Chain Practices) Market Investigation Order 2009 and the Groceries Supply Code of Practice."  In order to ensure compliance, Tesco "ha[s] in place a Code Compliance Officer ('CCO') supported by a

compliance team including a dedicated Code auditor.  We have an audit plan and our approach enables us to identify any gaps in our processes so they can be quickly fixed."

131.    Such statements were materially false and misleading because Tesco admitted that there was a £155 million overstatement of income during the larger period including 2012/13, based on the manipulation of commercial income.  Indeed, in the entire 137 page Annual Report, Tesco did not even once mention commercial income or its effect on Tesco's financials.  Moreover, Tesco's relationship with its suppliers deteriorated significantly over the period, undercutting Tesco's repeated statements concerning Tesco's efforts to build positive relationships with its suppliers.  In addition, the numerous internal audit, compliance and fraud detection mechanisms that were purportedly in place failed to uncover or correct for the massive accounting fraud that eventually eclipsed half a billion dollars in total.  Further, Tesco later admitted to probable violations of the UK Groceries Supply Code of Practice, and also admitted that it is under investigation by the SFO which has jurisdiction to levy criminal penalties for violation of UK's Bribery Act.  Tesco also later admitted that its property valuations for its UK properties were overstated by approximately 30%, rendering Tesco's reassuring statement concerning the fair value of its "UK property pipeline" to be materially false and misleading.

### I.    Interim Results for First Half of 2013/14

132.    On October 2, 2013, the Company reported its interim financial results for the first half of 2013 (for the 26 weeks ended August 24, 2013).  Tesco reported £1.59 billion ($2.41 billion) in half-year trading profits, with UK revenues of £21.63 billion ($32.82 billion) and UK trading profit of £1.13 billion ($1.72 billion).  Defendant Clarke told investors that the Company's financial performance was driven by the "strengthening" of its UK business, reporting that:

Despite continuing challenges, we have made **further progress on our strategic priorities**.  We are strengthening our UK business, working to establish multichannel leadership and pursuing disciplined international growth.

**Our performance in the UK has strengthened** through the half, particularly in our food business, as we have continued our work to Build a Better Tesco.  More and more customers are benefiting from a better shopping environment, as our store refresh programme has gathered momentum….

Today we have announced a partnership with China Resources Enterprise Ltd. (CRE) to create the leading food retailer in the world's most populous country.  This, together with the conclusion of our strategic review in the United States, provides further evidence of our **commitment to disciplined international growth** and, more broadly, our approach to growth and returns.

133.    With respect to the Company's UK operations, Tesco explained that "[o]ur plans to Build a Better Tesco in the UK have continued apace in the first half, with more and more customers seeing and responding positively to the changes we have made to our stores, our products, our marketing and the level of service we offer," and reported sales and profits for the first half of 2013/14 in the UK as follows:

- UK sales up 1.1% to £24.2 billion
- UK revenue (exc. VAT) up 1.1% to £21.9 billion

134.    On November 28, 2013, in response to statements from analysts at Cantor Fitzgerald suggesting that Tesco prematurely demanded payment from suppliers in order to support the Company's short-term profit margins, Tesco flatly denied any problems with its treatment of suppliers, stating that Cantor Fitzgerald's criticisms were "based on speculation" and that no such complaints had been received from its suppliers.

135.    Such statements were materially false and misleading because Tesco later admitted that there was a £155 million overstatement of income during the larger period including the first half of 2013/14, based on a manipulation of commercial income.  Any "strengthening" "performance in the UK" was solely as a result of Tesco's faulty reporting of its

financials, not based upon Tesco's purported implementation of the Build a Better Tesco program.  Further, later revelations have revealed that Tesco was in fact demanding up-front payments from suppliers to satisfy short-term profit expectations, rendering Tesco's denial of such misconduct taking place as mere "speculation" an outright lie.

###### J.      Interim Results for Third Quarter of 2013/14

136.    On December 4, 2013, the Company reported its interim financial results for the third quarter of 2013/14 (for the 13 weeks ended November 23, 2013).  Tesco reported that its UK sales had grown 0.9% and like-for-like sales had decreased by 1.5% due to a "weaker growth . . . in the UK grocery market as a whole."  CEO Phillip Clarke attributed the decline in like-for-like sales to "[c]ontinuing pressure on UK household finances [which] have made the grocery market more challenging for everyone," as well as to actions taken by Tesco to "position the business for the future."  Nevertheless, Tesco was purportedly "performing in line with market expectations for the full year."

137.    Clarke further alleviated concerns regarding Tesco's performance by noting that its customers continued to "respond positively to the changes we are making to the UK business to differentiate our offer and position Tesco as a multichannel leader."  Clarke noted that the Company was "confident that [its] strategic priorities—strengthening the UK business, establishing multichannel leadership and ensuring capital discipline—are the right ones and that they will drive long-term value and returns."

138.    On February 25, 2014, the Company hosted a seminar for investors and analysts, taking the opportunity to reiterate its priority to invest in its UK business and to discuss the progress it had made in strengthening that business.  Jamie Wilhelm, Plaintiffs' investment advisor responsible for purchasing the Tesco ADRs, participated in the seminar via live webcast.

Emphasizing Tesco's dominant position in the market, Clarke stated that while "consumers are changing more quickly than ever before and like many offline retailers, we are facing some significant challenges . . . we see many more opportunities for the long-term and uniquely, we are placed to lead." Describing Tesco's strategy to reinvent itself, Clarke also stated that its initiatives would "power growth in the medium-term and in the long-term."

139. At the same seminar, Chris Bush, managing director of Tesco's UK operations, discussed Tesco's strategy to continue to invest in its UK operations. Bush cited three main factors that demonstrated this commitment and the success it was having: (i) overall customer satisfaction had purportedly improved 40% since 2012, (ii) customer perception measures on price had purportedly improved over the previous 12 months, and (iii) at Tesco's stores that had been "refreshed," average sales, profits and margins were purportedly all up and that those "trends have continued." Bush further addressed initiatives that the Company had undertaken to improve customers' experiences with its Building a Better Tesco Plan, including its additions to Tesco's Clubcard. Specifically, Bush noted that the Clubcard, which was "absolutely at the heart of all of these plans, at the heart of our relationship with our customers," was "driving both loyalty and driving sales."

140. Such statements were materially false and misleading because Tesco later admitted that there was a £53 million overstatement of revenue in 2013/14, based on Tesco's overstatement of commercial income. Accordingly, the purported "success" that Tesco was experiencing was not the result of Build a Better Tesco or Tesco's Clubcard, but was solely the result of Tesco's fraudulent financials.

### K. Preliminary Results for 2013/14

141. On April 16, 2014, Tesco released its preliminary year-end results for the fiscal

year 2013/14 (the 52 weeks ended February 22, 2014).  Tesco reported £3.32 billion ($5.04 billion) in annual trading profits, with UK revenues of £43.06 billion ($65.36 billion) and UK trading profit of £2.19 billion ($3.32 billion).  With respect to its UK business, the Company explained that while the performance in the UK had been "held back by the difficult and more competitive trading environment . . . [its] work to 'Build a Better Tesco' has strengthened the foundations of the business" and reported sales and profits in the UK as follows:

- UK sales down 0.1% to £48.2 billion
- UK revenue (exc. VAT) of £43.6 billion, which represents 0.0% growth

142.    Clarke attributed the slight decline in Tesco's performance in the preliminary year-end results to the "overall retail market" and the continued effects of the consumer recession, but reassured investors by stating that the Company was set to "go faster with our plans to make Tesco in the UK a better business."  He further stated that Tesco continued to reduce prices and that customers were responding favorably; indeed, Clarke noted the "[v]olumes are improving."

143.    Such statements were materially false and misleading because Tesco later admitted that there was a £208 million overstatement of income during the larger period, including the 2013/14 fiscal year, based on a manipulation of Company financials.  Consequently, Tesco's sales and revenue figures reported for the period had nothing to do with Build a Better Tesco in the UK, but were based upon Tesco's overstatement of commercial income and the delayed accrual of costs.

### L.    2014 Annual Report

144.    In its 2014 Annual Report published on May 9, 2014 concerning Tesco's financials for 2013/14 (for the 52 weeks ended February 22, 2014), the Company addressed its purported commitment to investors, stating that it was meeting new standards of disclosure and

that it was implementing "*levels of transparency and disclosure which are undoubtedly now world-leading*." It further highlighted its "Tesco Values" which purportedly helped Tesco to "consistently and transparently do the right thing."

145. As stated in the report, the Company's longtime auditor, PwC, flagged Tesco's accounting of commercial income, including its arrangements with suppliers, as a "*risk of manipulation*." The Company's Audit Committee disregarded, however, the warning and assured investors that commercial income was not a "significant issue for disclosure":

> [C]ommercial income was an area of focus for the external auditors based on their assessment of gross risks. It is the Committee's view that whilst commercial income is a significant income for the Group and involves an element of judgement, *management operates an appropriate control environment which minimises risks in this area. As a result, the Committee does not consider that this is a significant issue for disclosure in its report*.

146. In addition, the 2014 Annual Report again listed the key controls involved in Tesco's "[f]raud, compliance and control" policies, which were materially identical to those listed in the 2013 report, with two new additions:

- Training is provided to help colleagues comply with policies and procedures

- A comprehensive compliance programme is in place to promote, monitor and review compliance with the UK Groceries Supply Code of Practice

147. The 2014 Annual Report also stated that the Tesco Board of Directors have "general responsibility" to "safeguard the assets" and "to prevent and detect fraud."

148. The 2014 Annual Report also reported Tesco's financial results from its UK operations as follows:

- UK Sales - £48.18 billion
- UK Revenue - £43.57 billion
- UK Trading Profit - £2.19 billion

149. Such statements were materially false and misleading because Tesco later

admitted that there was a £155 million overstatement of income in 2013/14 based on a manipulation of commercial income. Indeed, Tesco's own auditor even *emphasized* its disagreement with Tesco that further disclosures should have been made with respect to Tesco's reporting of commercial income, which Tesco simply rejected. Instead, Tesco decided to continue to report its bogus financials for the period based on an overstatement of commercial income and delayed accrual of costs. Further, any purported internal safeguards again failed to uncover or correct the massive income manipulation and overstatement for the period. In addition, Tesco later admitted in its 2015 Annual Report that the Company "probably" violated the UK Groceries Supply Code of Practice, which conflicts with its numerous statements that it was Code compliant. Tesco also failed to "safeguard the assets" of the Company when it reported later that its valuations for Tesco property in the UK were overstated by approximately 30%.

### M.      Interim Management Statement for First Quarter of 2014/15

150.      On June 4, 2014, Tesco released its first quarter 2014/15 interim management statement. The Company touted the quarter as one of "significant improvement for customers, with a greater focus on building long-term loyalty." CEO Clarke stated that Tesco was "more competitive than [it had] been for many years," while also noting that Tesco continued to face some challenging consumer trends in the UK, attributable to "subdued levels of spending in addition to the more structural changes taking place across the retail industry." Clarke further assured the market that the Company was "pleased by the early response to our accelerated efforts to deliver the most compelling offer for customers" and that he expected "this acceleration to continue to impact our headline performance throughout the coming quarters."

151.      On that same day, Mr. Clarke gave an interview with *The Telegraph* where he

"insisted that Tesco is 'changing' and there is 'positive momentum' within the business."  Clarke went on to say that it would be "pointless" to draw conclusions from falling sales figures, and that "[i]t is too early to make a sound judgement on the success of the business transformation programme.  It is not something that happens overnight.  This is a short-term number."

152.     Such statements were materially false and misleading because Tesco later admitted that there was a £118 million overstatement of income during the first half of 2014, based on a manipulation of commercial income.  Accordingly, the purported "significant improvement for customers" leading to "headline performance" in Tesco's reported earnings was completely bogus, and was instead the result of Tesco's manipulation of its financials.

### N.     Trading Update for 2014/15

153.     On August 29, 2014, Tesco released its Trading Update for the first-half of 2014/15 (for the six months ended August 23, 2014).  Tesco reported Group trading profit for the six-month period to be approximately £1.1 billion.  In addition, Tesco announced Group trading profit for fiscal year 2014/15 (ending in February 2015) to be in the range of £2.4 billion to £2.5 billion.  With the release of these financials, Broadbent stated that "the Board's priority is to improve [] performance" and that Tesco has "taken prudent and decisive action solely to that end."

154.     Such statements were materially false and misleading because Tesco later admitted that there was a £118 million overstatement of commercial income during the first half of 2014/15.  Thus, for this half-year period, Tesco admitted that its £118 million commercial income overstatement for its UK operations was so large that its total Group "trading profit" for the worldwide Tesco operations of £1.1 billion was overstated by approximately 11%.  To put this overstatement in context, Tesco reported trading profit for its UK operations to be £467

million for 2014/15. Assuming 50% of that profit should be allocated to the first half of 2014/15 – yielding £233.5 million for 1H 2014/15 – then Tesco's 118 million overstatement of commercial income amounts to a ***50.1% overstatement of Tesco's reported UK trading profit for the period***.

### O. Oral and Email Communications Between Tesco and Plaintiffs

155.     Tesco touted the strength of Tesco's financials to Plaintiffs by way of telephone calls, emails, interactive online seminars, and in-person meetings between Tesco investment marketing employees and Plaintiffs.

156.     Specifically, Chris Griffith, a Tesco Investor Relations Director, Gillian Robb, a Tesco Investor Relations Manager, and Nick Coulter, a Tesco Investor Relations Director, made numerous telephone calls and sent at least 75 emails and related correspondence to Jamie Wilhelm, Plaintiffs' investment advisor involved in the purchase of the Tesco ADRs, touting Tesco's business and its financial performance. These communications began in February 2012 and continued through at least September 2014 (*i.e.* throughout the Relevant Period).

157.     For example, on March 5, 2012, Mr. Griffith emailed in response to Mr. Wilhelm's questions concerning the financial effects of Tesco's United States operations:

> The losses peaked last year at £186m in 2010/2011 – we have said that losses will come down sharply in the year we are about to report (to Feb 2012) and that the next milestone will be to reach the break-even point at around the end of the 2012/13 financial year. The sharp reduction in losses this year and the milestone around break-even were new targets our new CEO, Phillip Clarke, laid out for the business last year and we have not gone beyond them in terms of what could happen if they were not met and the business was not on good trajectory.

158.     On June 21, 2013, Ms. Robb had a call with Mr. Wilhelm to discuss, among other things, the financial performance of Tesco. Later that same day, Ms. Robb emailed Mr. Wilhelm links to the "Preliminary Results" for 2012/13, including the "presentation deck" and link to the

Tesco webcast discussing the financials.  Also included in the email was a link to videos about Tesco's performance, including videos concerning "Building a Better Tesco in the UK in particular given our discussions this morning."

159.    On August 22, 2013, Mr. Wilhelm visited with Mr. Griffith and Ms. Robb in London to discuss, among other things, Tesco's financials and Tesco's "six point plan" aimed at turning around Tesco's floundering profits.  At the meeting, Mr. Griffith and Ms. Robb emphasized the positive effects being done under the "Build a Better Tesco" plan for Tesco's UK stores.  After the meeting, Mr. Wilhelm went with at least one Tesco representative to a Tesco Superstore, Tesco Metro, and Tesco Express so that Mr. Wilhelm could see first-hand the purported improvements done to the stores under the "Build a Better Tesco" program which were allegedly fueling Tesco's turnaround.  Mr. Wilhelm was never told or led to believe that there was any possible misstatement of Tesco's commercial income or any issue with the delayed accrual of costs (or any other financial reporting issues).

160.    On January 14, 2014, Mr. Wilhelm emailed Mr. Griffith, Ms. Robb and Mr. Coulter with four separate questions concerning Tesco's financials, including Tesco's declining like-for-like sales at its stores:

> #1 [S]omeone told me that market share is not the key metric you guys use to prove success.  Why not?
>
> #2 [D]o you guys view the loss of market share a structural one therefore using price wouldn't work?
>
> #3  LFL sales are negative in all territories.  It seems to me the company needs to be even more proactive in pulling out of some markets.  Agree or disagree?  And why not?
>
> #4  In the UK things are not getting better as you guys just reported the worst like for likes in recent years.  This is after several actions.  This is concerning.  Doesn't more need to be done?

I am just trying to get my arms around why after several actions things are not
getting better in the UK and all the other territories are poor as well.

This led to a telephone call between the parties to discuss the issues Mr. Wilhelm raised.  Again,

Mr. Wilhelm was never told of any issue with respect to Tesco's overstatement of commercial

income or delayed accrual of costs.

161.    On February 25, 2014, Mr. Wilhelm took part in a Tesco webcast seminar to

investors and analysts entitled "Investor and Analyst Seminar: Winning in the new era of retail"

after Mr. Griffith invited Mr. Wilhelm to participate.  The seminar was hosted by CEO Clarke,

CFO McIlwee, and UK Managing Director Bush, as well as Robin Terrell, Tesco's Group

Multichannel Director.  The seminar discussed Tesco's business and its financials.  A description

of the seminar in a News Release was also sent by Ms. Robb to Mr. Wilhelm, which touted the

financial strength of the Company, including its efforts in turning around its UK business:

> Tesco will *outline the progress that has been made over the past two years to
> strengthen the foundations of its UK business.*  It will describe how it is
> accelerating growth in new channels and investing in sharper prices, improved
> quality, stronger ranges and better service.
>
> Reflecting its strategic priorities, the Group's capital expenditure will be even
> more focused on online and convenience growth and on an accelerated refresh
> programme for its larger stores.  Consistent with its *rigorous approach to capital
> discipline*, Tesco will describe a further significant reduction in planned net new
> space growth, with the result that Group capital expenditure will be reduced to no
> more than £2.5bn per year for at least the next three financial years.
>
> Tesco will describe to investors how 'Winning in the new era of retail' is about
> putting the customer first and how by delivering the most compelling offer across
> all channels, it is *focusing on increasing loyalty and improving sales, leading to
> sustainable profits and returns over the medium term, consistent with its financial
> guiderails.*

162.    On March 13, 2014, Mr. Wilhelm emailed Mr. Coulter and Ms. Robb with

concerns over reports of senior management of Tesco leaving and a Tesco competitor in the UK,

Morrison's, cutting its prices.  Thereafter, Mr. Coulter and Mr. Wilhelm discussed the financial

condition of Tesco.  Mr. Coulter reassured Mr. Wilhelm of Tesco's business model and the

optimistic forecasts for Tesco in the future.

163.    On March 14, 2014, Mr. Coulter emailed Mr. Wilhelm concerning the "strengths"

of Tesco's business model in response to concerns from Mr. Wilhelm that Tesco was losing

market share:

> One of our greatest strengths and why our share is so strong is that we are 'for
> everyone' and we are increasingly sophisticated in using our loyalty insight to
> make sure that we [are] relevant to each of our customers and to each store
> catchment.  I think this plays back to our conversation yesterday about how we
> have strong leads in loyalty, insight, convenience and online, coupled with
> national and global scale.

164.    On March 20, 2014, Mr. Coulter emailed Mr. Wilhelm in response to concerns

over Tesco's dropping share price that "[t]he investors we have spoken to are generally

supportive but common to all is that they want to see firm evidence of the changes we are

making and how that is being received by customers.  Clearly, this is something we will seek to

provide."  While Tesco may have reported increasing profits for its UK operations, Tesco failed

to provide the "firm evidence" as promised because any improvements of Tesco's UK operations

were the result of Tesco's financial reporting fraud, not the "Build a Better Tesco" initiative.

165.    In addition, statements from Tesco personnel were made to Mr. Wilhelm that

explicitly touted Tesco's leverage over suppliers that allowed Tesco to earn lucrative commercial

income.  Mr. Wilhelm was never told, however, that Tesco was manipulating commercial

income in order to boost its reported bottom line.

166.    Further, Tesco's own website marketed its ADRs to American investors such as

Plaintiffs.[12]  Tesco's website explains what ADRs are generally, describes Tesco-specific ADRs,

---

[12] *See ADR Information*, Tesco plc, available at http://www.tescoplc.com/index.asp?pageid=51 (last visited Oct. 2, 2015); *Buying, selling and transferring*, Tesco plc, available at http://www.tescoplc.com/index.asp?pageid=52 51 (last visited Oct. 2, 2015); *Changes in personal circumstances*, Tesco plc, available at

and provides potential U.S. investors with instructions for purchasing and maintaining the ADRs. Indeed, the website even provides contact information for "shareholder queries" for holders of the Tesco ADRs, including a mailing address in New York, an email address, and a toll free phone number.

167.    All of the statements and omissions described above were materially false and misleading.  The statements concerning the Company's revenue and profits were false and misleading because, as would later be revealed, the Company's accounting practices were improper and materially impacted the Company's financial results.  Specifically, Tesco improperly and prematurely recognized commercial income as revenue and delayed accrual of costs.  Further, Tesco's statements attributing its business performance to external factors such as changes in consumer behavior, Tesco's Clubcard, and the "Build a Better Tesco" initiative were false and misleading because the Company failed to disclose that because of its manipulation of the Company's financial results — including by prematurely recognizing revenue, delaying costs and otherwise manipulating the Company's accounting — its reported revenues, profits and other financial metrics were materially false and artificially inflated.  Tesco's omissions were unquestionably material.  Indeed, Tesco's omission concerning inflated commercial income alone amounted to *half a billion dollars in overstated financial income* that Tesco reported to the marketplace.  As a result, contrary to the Company's representations, Tesco was anything but transparent when it came to its disclosures to investors.

## IV.    VIOLATIONS OF APPLICABLE ACCOUNTING REGULATIONS

168.    As stated in its 2014 Annual Report, Tesco's Directors are required by the UK Companies Act 2006, *inter alia*, "to prepare financial statements for each financial year which

---

http://www.tescoplc.com/index.asp?pageid=53 51 (last visited Oct. 2, 2015); *Check your account*, Tesco plc, available at http://www.tescoplc.com/index.asp?pageid=54 51 (last visited Oct. 2, 2015).

give a true and fair view of the . . . profit or loss of the Group for the financial year.  Under that

law the Directors are required to prepare the Group financial statements in accordance with

International Financial Reporting Standards ('IFRS') as adopted by the European Union ('EU')

and . . . in accordance with UK Accounting Standards."  Tesco is also subject to financial

reporting regulations set forth in The UK Corporate Governance Code, established by the

Financial Reporting Council ("FRC"), the UK regulator responsible for promoting high quality

corporate governance.

169.    Pursuant to IFRS, Tesco was subject to pronouncements by (i) the International

Accounting Standards Board, (ii) the Financial Reporting Interpretations Committee, (iii) the

International Accounting Standards Committee, and (iv) the Standing Interpretations Committee.

Tesco failed to abide by the applicable accounting pronouncements and regulations issued by

these entities, notwithstanding Tesco's statements to the contrary.

### i.    Recognition of Commercial Income as Revenue

170.    IAS 18 ("Revenue") "outlines the accounting requirements for when to recognise

revenue from the sale of goods, rendering of services, and for interest, royalties and dividends."

As to "Recognition of Revenue," IAS 18 requires that the revenue meet each of the following

criteria:

    a)  it is probable that any future economic benefit associated with the item of revenue
        will flow to the entity, and

    b)  the amount of revenue can be measured with reliability.

171.    For the recognition of "Rendering of Services" as revenue, IAS 18.20 provides:

    When the outcome of a transaction involving the rendering of services can be
    estimated reliably, revenue associated with the transaction shall be recognised by
    reference to the stage of completion of the transaction at the end of the reporting
    period.  The outcome of a transaction can be estimated reliably when all the
    following conditions are satisfied:

(a) the amount of revenue can be measured reliably;

(b) it is probable that the economic benefits associated with the transaction will flow to the entity;

(c) the stage of completion of the transaction at the end of the reporting period can be measured reliably; and

(d) the costs incurred for the transaction and the costs to complete the transaction can be measured reliably.

172.     According to IAS 18.30(b), "royalties shall be recognised on an accrual basis in accordance with the substance of the relevant agreement."

173.     With respect to Tesco's reporting of commercial income as revenue, Tesco violated each of the provisions of IAS 18 by hundreds of millions of dollars – at least $500 million when combined with commercial income cost reductions.  This includes commercial income that was *prematurely* recorded as revenue (meaning Tesco could not justify recording such revenue in the period it did so), and commercial income that was *fictitiously* recorded as income (meaning that Tesco could never justify recording such revenue).  Among other things, Tesco issued bogus invoices to suppliers and booked promotional income before actually selling all the goods required to be sold which would otherwise have triggered Tesco's right to the promotional income, which violated IAS 18's requirements that it was "probable" that the revenue would be earned and that the revenue could be "measured reliably."

**ii.     Recognition of Commercial Income Cost Reductions and Delayed Accrual of Costs**

174.     With respect to commercial income cost reductions, commercial income from rebates and discounts under IFRS is governed primarily by IAS 2 ("Inventories").  Under IAS 2.11, rebates and purchase discounts are not recorded as revenue, but as a reduction to the cost of inventory, or, if the inventory has already been sold, as a reduction to the cost of sales.  Tesco

violated IAS 2 and related IFRS requirements by, *inter alia*, recording tens or hundreds of millions of dollars (combined with commercial income revenue, at least $500 million) in reductions to cost of sales before the products were actually sold.  Tesco also violated IAS 2 when it recorded rebates and discounts that it was not contractually entitled to, or to which the seller had not agreed, or was not willing to provide at a discount.

175.    In addition, Tesco has not been transparent regarding what it referred to as "delayed accrual of costs."  This refers to Tesco's failure to report "certain expenses" in the period the expenses were incurred.  IAS 38 details the proper accounting for "Intangible Assets." IAS 38.26-38.29 makes clear that sales expenses must be recognized immediately.  In other words, when Tesco said it "delayed accrual of costs," it meant that Tesco failed to record expenses which, under IFRS, are not permitted to be deferred.

**iii.    Required Disclosures Concerning Accounting Policies**

176.    According to IAS 18.35, Tesco was required to disclose the "accounting policies adopted for the recognition of revenue, including the methods adopted to determine the stage of completion of transactions involving the rendering of services" (IAS 18.35(a)), as well as "the amount of each significant category of revenue recognised during the period," including revenue arising from each of the following categories:

    i.    the sale of goods;
    ii.    the rendering of services;
    iii.    interest;
    iv.    royalties;
    v.    dividends

IAS 18.35(b).

177.    IAS 18.35(c) reiterates that an entity is required to disclose "the amount of revenue arising from exchanges of goods or services included in each significant category of

revenue."

178.    Tesco violated IAS 18.35 when it failed to disclose the impact of commercial income on its reported revenue and profit over the relevant period.  For example, Tesco's 2013 Annual Report did not even once mention commercial income, even though it was later revealed that commercial income was overstated as profit by £326 million ($500 million) overall.  In addition, Tesco admitted in its 2014 Annual Report that commercial income, for which the Company provided zero disclosure against its auditor's wishes, constituted a "significant income for the Group."  Tesco also failed to disclose that its improper recognition of commercial income and delayed accrual of costs were propping up Tesco's property values, when it was later revealed in 2015 that Tesco's UK properties were overvalued by approximately 30%.

### iv.    Tesco's Use of Undefined "One-Off" Charges to Hide Billions in Delayed Costs and Expenses Violates Accounting Principles

179.    Tesco reported billions of pounds of charges and expenses as "one-off" charges,[13] including routine supermarket expense categories such as provisions for inventory losses, customer redress and property losses.  This includes the £4.7 billion "one-off" charges for 2014/15, and similarly vague "one-off" charges of £1.4 billion in 2012/13 and £636 million in 2013/14.

180.    However, there is no basis under the IAS, IFRS, or GAAP for the reporting of such "one-off" charges without further information, especially when the "one-off" charges are reported on such a massive scale.  IAS 34, Interim Financial Reporting, required Tesco to provide "an explanation of events and transactions that are significant to an understanding of the changes in financial position and performance of the entity since the end of the last annual reporting period."  IAS 34 ¶ 15.

---

[13] Even Tesco uses quotations marks for its so-called "one-off" charges.

181. According to IAS 8, Accounting Policies, Changes in Accounting Estimates and Errors, prior period accounting errors are to be reported in a "retrospective restatement" to provide the correct financials "as if a prior period error had never occurred." IAS 8. "Materiality depends on the size and nature of the omission or misstatement judged in the surrounding circumstances." *Id*. Tesco violated IAS 8 when, in both its interim and year-end financial statements for 2014/15, it failed to correct 2013/14 for the commercial income errors or explain the basis for its multi-billion pound "one-off" charges.

## V. PLAINTIFFS PURCHASED TESCO ADRs IN RELIANCE ON TESCO'S MATERIALLY FALSE AND MISLEADING STATEMENTS

182. From March 12, 2012 through July 23, 2014, Plaintiffs purchased 3,880,382 Tesco ADRs from the over-the-counter market in the United States. The Tesco ADRs represent interests in Tesco shares held at a depository bank, Deutsche Bank Trust Company Americas, in the United States.

183. Plaintiffs purchased the ADRs at the peak of their historical value at an average price of approximately $16.22, for an aggregate price of more than $64.6 million.

184. In accordance with Plaintiffs' due diligence process in the purchase of the ADRs, Plaintiffs' investment advisor reviewed each Tesco financial statement and earnings announcement issued from January 1, 2012 through at least July 23, 2014. Plaintiffs' investment advisor also reviewed statements from Tesco employees and executives to the media and directly to the investment advisor concerning Tesco's financials, revenue, profits and losses, property value, accounting practices, fraud detection, financial controls and related topics over the Relevant Period.

185. Moreover, as set forth above, Tesco specifically marketed the strength of Tesco's financials directly to Plaintiffs by way of telephone calls, emails, webcast seminars, and in-

person meetings between Tesco's investor relations employees and Plaintiffs' investment advisor responsible for investing in the Tesco ADRs.

186.    Such statements and omissions were relied upon by Plaintiffs in the purchase and continued retention of the Tesco ADRs over the Relevant Period.  Such statements and omissions later turned out to be materially false and misleading.

187.    Plaintiffs would not have purchased the ADRs if they had known that there were any accounting irregularities at issue, let alone the massive accounting fraud that subsequently came to light.  Indeed, Plaintiffs' internal investment guidelines and marketing materials preclude any investments in companies with accounting irregularities.  Plaintiffs were also particularly reliant on Tesco's property valuations, which were later revealed to be fraudulently inflated by approximately 30% in the UK, largely because of Tesco's improper recognition of income purportedly being generated from Tesco's stores.

## VI.    SCIENTER ALLEGATIONS

188.    As alleged more fully above, Tesco knew that the documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Below is a summary highlighting some examples.

189.    Tesco's own October 2014 disclosure concerning Deloitte's audit of Tesco's financials contained an admission that the financial reporting manipulations were "contrary to Tesco Group accounting policies," even though the financials were previously released with assurances that the numbers reported were in accordance with Tesco's own accounting policies

(as well as all applicable accounting regulations such as the IAS and IFRS).  The magnitude of the resulting restatement amounting to half a billion dollars in overstated Company income is powerful evidence that Tesco acted with knowledge of the falsity of the financials or with reckless disregard for the truth.  Moreover, as one analyst observed, the nature of the fraud concerning the improperly delayed accrual of costs demonstrates that Tesco went to great lengths to hide the fraud.  The analyst stated that "[i]n today's world of electronic invoicing, that's not easy to do, and had to be consciously managed."

190.    CFO McIlwee had knowledge of accounting improprieties concerning a Tesco affiliate in Poland in 2012 according to an article by the BBC.  The article reported that McIlwee warned in an April 2012 email about faulty "financial controls" at the Polish affiliate in an email to the finance staff stating, "[y]ou should be in no doubt as to the seriousness [of] mis-declarations" of profit.  The email further stated that early accounting of profits was forbidden "where they cannot be justified."  As McIlwee undeniably had specific knowledge of the same type of accounting problems going on in an affiliate in a foreign country, he must have also had knowledge of the same practices occurring on a much larger scale in his home country.

191.    Moreover, as detailed in Tesco's 2014 Annual Report concerning its 2013/14 fiscal year, the Company knew that the commercial income reported as profit during that period was materially false and misleading because such commercial income and profit calculations violated Tesco's internal accounting policies and were specifically flagged by the Company's auditor, PwC, as an area with a "risk of manipulation."  Nevertheless, Tesco determined that commercial income was not "a significant issue for disclosure" because according to Tesco, "management operates an appropriate control environment which minimises risks in this area." Tesco admitted that such statements were false, most notably in Tesco's 2015 Annual Report

where Tesco's new CEO and Chairman of the Board expressed "regret" for the "commercial income issue," which had caused the need to "rebuild trust" with shareholders.

192.    In addition, Tesco admitted in its 2015 Annual Report to, among other things, "probable breaches" of the UK Groceries Supply Code of Practice.

193.    The "whistleblower" that disclosed the accounting fraud to incoming CEO Dave Lewis in September 2014 also revealed the fraud months earlier to the Tesco senior executives, who summarily ignored the whistleblower's report.  According to a senior source at Tesco, the *International Business Times* reported on September 29, 2014 that the Tesco whistleblower had "alerted senior executives to the £250 million shortfall in profits on the retailer's books," which was "ignored for months."  According to the Tesco source, the whistleblower had "alerted senior bosses at Tesco in July [2014] of concerns but 'failed to get traction.'"

194.    Further, as set forth above in Section I(D), CW1, CW2, and CW3 all confirmed that Tesco fabricated invoices that were never collected by Tesco.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

195.    By misrepresenting its financials including commercial income, delayed accrual of costs, risk exposure, and the value of its assets, the Company presented a misleading picture of Tesco's business, the source and significance of its revenue, and the Company's compliance with the law.  Instead of truthfully disclosing that Tesco's profits had been artificially inflated by improper revenue recognition practices, including improperly recognizing commercial income and failing to accrue costs, the Company falsely reported Tesco's financial condition and outlook.

196.    The Company's statements concerning its financial condition and compliance with the law as described herein caused and maintained the artificial inflation in the price of the

ADRs throughout the Relevant Period, until the truth was revealed to the market.

197.    The Company's false and misleading statements had the intended effect and caused the ADRs to trade at artificially inflated levels throughout the Relevant Period.

198.    As alleged herein, the truth about Tesco's financial condition emerged in a series of partial disclosures between and including those on September 22, 2014, October 23, 2014, April 22, 2015 and in Tesco's 2015 Annual Report.  As a result of these partial corrective disclosures of the truth, Tesco's ADR share price fell nearly 30%, from $11.29 per share at the close of trading on September 19, 2014 to $8.18 on October 23, 2014.

199.    Throughout the Relevant Period, the ADRs traded on over-the-counter markets in the United States, and the Company's ordinary shares traded on the London Stock Exchange. These two markets were efficient markets that promptly digested current information with respect to Tesco from publicly available sources and reflected such information in the prices of the ADRs and ordinary shares.

200.    The evidence that Tesco's ADRs traded on an efficient market at all relevant times includes the following:

i.    The ADRs met the requirements for listing, and were listed and actively traded on OTC Pink, a highly efficient and automated market, and Tesco's ordinary shares met the requirements for listing, and were listed and actively traded on the London Stock Exchange, one of the most highly efficient markets in the world;

ii.    As a regulated issuer, Tesco filed periodic and other public reports with the Financial Conduct Authority's UK Listing Authority, the SEC, and OTC Pink;

iii.    The average daily trading volume for Tesco ADRs during the period between when Plaintiffs first purchased the ADRs in March 2012 through the release of the first

accounting restatement in September 2014, was more than 800,000 shares, and the average daily trading volume for Tesco ordinary shares was more than 30 million shares;

      iv.      During the Relevant Period, Tesco was followed by multiple securities analysts who wrote reports about Tesco that were distributed to their clients, and each of these reports was publicly available and entered the public marketplace;

      v.      Tesco regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      vi.      Tesco securities were liquid and traded with moderate to heavy volume during the relevant period.

## VIII.  NO SAFE HARBOR

201.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements and omissions described in this Complaint.  Many of the specific statements described herein were not identified as "forward-looking" when made.  To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

202.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described herein, Tesco is liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false, and/or that the forward-looking statement was authorized

and/or approved by an executive officer of Tesco who knew that those statements were false when made.

### FIRST CAUSE OF ACTION
#### (Violation of ORC § 1707.44(J))

203.    Plaintiffs reallege each allegation above as if fully set forth herein.

204.    This claim is brought under the Ohio Securities Act, ORC § 1707.44(J), against Tesco.

205.    Tesco knowingly made or caused to be made materially misleading false statements and omissions concerning the amount of revenue and profit earned by Tesco, the amount of commercial income from suppliers, the value of Tesco's fixed assets, and the fraud detection practices and accounting and financial controls in place at the Company, among other things.  These statements and omissions negatively affected the value of the ADRs.

206.    Tesco had knowledge of the misrepresentations and omissions of material facts set forth herein by virtue of the fact that, at a minimum, the Company failed to exercise reasonable diligence in ascertaining their falsity.

207.    By virtue of the foregoing, Tesco has violated ORC § 1707.44(J).  As a direct and proximate result of Tesco's wrongful conduct, Plaintiffs have suffered damages in connection with the purchase and subsequent decline in value of the ADRs.

### SECOND CAUSE OF ACTION
#### (Violation of ORC § 1707.44(G))

208.    Plaintiffs reallege each allegation above as if fully set forth herein.

209.    This claim is brought under the Ohio Securities Act, ORC § 1707.44(G), against Tesco.

210.    Tesco knowingly engaged in acts prohibited under the Ohio Securities Act and

defined as fraudulent.

211.    By virtue of the foregoing, Tesco violated ORC § 1707.44(G).  As a direct and proximate result of Tesco's wrongful conduct, Plaintiffs have suffered damages in connection with the purchase and subsequent decline in value of the ADRs.

## THIRD CAUSE OF ACTION
### (Rescission pursuant to ORC § 1707.43)

212.    Plaintiffs reallege each allegation above as if fully set forth herein.

213.    This claim is brought under the Ohio Securities Act, ORC § 1707.43, against Tesco.

214.    As set forth in the First and Second Causes of Action, Tesco made sales in violation of the Ohio Securities Act or participated in or aided the sellers in making such sale.

215.    Plaintiffs are entitled to void and rescind their purchase of the ADRs under ORC § 1707.43 and recover the full amount of consideration paid for the ADRs and all taxable court costs.

## FOURTH CAUSE OF ACTION
### (Common Law Fraud)

216.    Plaintiffs reallege each allegation above as if fully set forth herein.

217.    This claim is for common law fraud against Tesco.

218.    The material misrepresentations set forth above were fraudulent, and Tesco's representations fraudulently omitted material statements of fact.

219.    Tesco knew its misrepresentations and omissions were false and misleading at the time they were made.  Tesco made the false and misleading statements and omissions with the intent to defraud investors in Tesco like Plaintiffs.  Indeed, Tesco employees made fraudulent misrepresentations and omissions directly to the Plaintiffs' investment advisor responsible for the ADR purchases, in the form of emails, phone calls, webinars, and in-person communications.

220.   Plaintiffs justifiably relied on Tesco's false and misleading representations and omissions.

221.   Had Plaintiffs known the true facts regarding, among other things, the amount of revenue and profit earned by Tesco, the amount of commercial income from suppliers, the value of Tesco's fixed assets, and the fraud detection practices and accounting and financial controls in place at the Company, they would not have purchased the ADRs.

222.   As a result of Tesco's false and misleading statements and omissions, as alleged herein, Plaintiffs have suffered damages according to proof.  Tesco is liable to Plaintiffs for common law fraud.

## FIFTH CAUSE OF ACTION
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5)

223.   Plaintiffs reallege each allegation above as if fully set forth herein.

224.   Plaintiffs assert this Count pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder against Tesco.

225.   During the Relevant Period, the Company disseminated or approved the false statements set forth above, which they knew were, or deliberately disregarded as, false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

226.   Tesco violated Section 10(b) of the Exchange Act and Rule 10b-5 in that it:

a.   employed devices, schemes and artifices to defraud;

b.   made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

66

      c.       engaged in acts, practices and a course of business that operated as a fraud or

               deceit upon Plaintiffs in connection with their purchases of Tesco ADRs during

               the Relevant Period.

227.    Tesco had actual knowledge of the materially false and misleading statements and

material omissions alleged herein, and intended thereby to deceive Plaintiffs, or, in the

alternative, Tesco acted with reckless disregard for the truth in that it failed or refused to

ascertain and disclose such facts as would reveal the materially false and misleading nature of

the statements made, although such facts were readily available to the Company.  Such acts and

omissions of Tesco were committed willfully or with reckless disregard for the truth.  In

addition, Tesco knew or recklessly disregarded that material facts were being misrepresented or

omitted as described above.  Information showing that Tesco acted knowingly or with reckless

disregard for the truth is peculiarly within the Company's knowledge and control.

228.    As a result of the dissemination of the aforementioned false and misleading

reports, press releases and public statements, the market price of Tesco ADRs was artificially

inflated.  In ignorance of the adverse facts concerning Tesco's business and financial condition

which were concealed by the Company, Plaintiffs purchased Tesco ADRs at artificially inflated

prices and relied upon the price of the securities, the integrity of the market for the securities and

statements disseminated by the Company, and were damaged thereby.

229.    Plaintiffs have suffered damages in that, in reliance on the integrity of the market,

they paid artificially inflated prices for Tesco ADRs.  Plaintiffs would not have purchased Tesco

ADRs at the prices they paid, or at all, if they had been aware that the market prices had been

artificially and falsely inflated by Tesco's false and misleading statements and omissions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Rescission and recovery of the consideration paid for the Tesco ADRs, with interest thereon;

B.      Plaintiffs' monetary losses, including loss of market value and loss of principal and interest payments, on all claims other than Plaintiffs' claims for rescission;

C.      Attorneys' fees and costs;

D.      Prejudgment interest at the maximum legal rate;

E.      Treble and punitive damages; and

E.      Such other or further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: October 7, 2015

Respectfully Submitted,

/s/ Jean Geoppinger McCoy
David P. Kamp (0020665)
Jean Geoppinger McCoy (0046881)
WHITE, GETGEY & MEYER COMPANY, LPA
One W. Fourth Street, Suite 1700
Cincinnati, Ohio 45202
(513) 241-3685

*Attorneys for Plaintiffs The Western and Southern Life Insurance Company, Western & Southern Financial Group, Inc., Integrity Life Insurance Company, and Touchstone Strategic Trust*

OF COUNSEL:

Steven S. Fitzgerald
Fletcher W. Strong
WOLLMUTH MAHER & DEUTSCH LLP
500 Fifth Avenue
New York, New York 10110
(212) 382-3300